Priscilla **VILLINES**, Plaintiff,

v.

**UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, AFL–CIO, Defendant.**

**Civil Action No. 96–1886 (RMU).**

United States District Court,
District of Columbia.

March 31, 1998.

Abe W. Weissbrodt, John P. Racin, Weiss-brodt, Racin & Mielke, Washington, DC, for Priscilla Villines.

Warren Gary Kohlman, Bredhoff & Kai-ser, P.L.L.C., Willow Jean Prall, Decarol,

Connor & Selvo, Washington, DC, Gerald V. Sekvo, Decarlo, Connor & Selvo, Los Angeles, CA, for United Brotherhood of Carpenters and Joiners of America.

James Peter Holloway, Proskauer, Rose, Goetz & Mendelsohn, L.L.P., Washington, DC, for Humana Group Health Plan, Inc.

## *MEMORANDUM OPINION AND ORDER*

URBINA, District Judge.

### Granting Defendant's Motion for Summary Judgment or, in the alternative, Motion for Summary Adjudcation in Part, and Denying it in Part

### I. INTRODUCTION

Plaintiff Priscilla Villines brings this action alleging race and sex discrimination, and retaliation pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et ·seq.* (1994), Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 (1994), and the District of Columbia Human Rights Act ("DCHRA"), D.C.Code § 1–2501 *et seq.* (1992). In a subsequent pleading, the plaintiff withdrew her sex discrimination claims.[1] The remaining claims include three counts of race discrimination and three counts of retaliation.

This matters comes before the court on Defendant United Brotherhood of Carpenters and Joiners's ("UBC") Motion for Summary Judgment. There are four issues for the court to decide: whether (1) defendant's conduct over a six year period represents a series of related discriminatory events to constitute a continuing violation; (2) defendant's alleged conduct created a racially hostile work environment; (3) this hostile work environment made working conditions intolerable as to constructively discharge the plaintiff from her employment; and (4) defendant retaliated against the plaintiff during her employment for exercising her statutory right to complain of unlawful employment practices.

Upon consideration of the parties' submissions, the applicable law and the record herein, the court concludes that there are genuine issues of material fact in dispute concerning the existence of a racially hostile work environment and retaliation that allegedly resulted in the constructive discharge of the plaintiff. The court further concludes that plaintiff failed to establish a continuing violation of her rights and may not base her claims on events outside the applicable statute of limitations. As a result, the court grants the defendant's Motion for Summary Judgment in part and denies it in part.

### II. BACKGROUND

Plaintiff Priscilla Villines, a female African–American, began employment with defendant UBC in September 1974 as a research analyst. In 1986, the plaintiff was assigned to a wage and benefit analyst position in the defendant's Pension Department, where she was the only non-white employee. In 1990, a white male employee, Mr. Timothy Dunbar became plaintiff's supervisor. Plaintiff alleges that from May 1990 until her constructive discharge on August 18, 1995, Mr. Dunbar subjected her to persistent verbal intimidation and harassment on the basis of her race and treated her differently from white employees working in the office.[2]

Plaintiff's complaint is based on several events. First, the plaintiff avers that in May 1990, Mr. Dunbar singled her out for verbal abuse when she and a white co-worker left the office a few minutes before their scheduled coffee break.[3] The plaintiff alleges that Mr. Dunbar screamed at her to return to her desk, but allowed a white co-worker to leave for a break.[4] The plaintiff complained to Mr. Fred Reese, her union shop steward, about the incident. Mr. Reese arranged a meeting with himself, the plaintiff, Mr. Dunbar, and Ms. Barbara Wilson, defendant's Personnel Manager. At this meeting, Mr. Dunbar allegedly admitted that he yelled at the plaintiff and exhibited a different attitude towards

---

**1.** Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Opposition") at 4 n. 9.

**2.** Plaintiff's First Amended Complaint ("FAC") ¶¶ 6–7, 10.

**3.** Plaintiff's Opposition at 5.

**4.** *Id.*

her.[5] Plaintiff alleges that racial bias motivated Mr. Dunbar's disparate treatment. Defendant, on the other hand, attributes Mr. Dunbar's conduct to managerial and personality shortcomings rather than racial animus.[6]

Second, the plaintiff alleges that Mr. Dunbar's discriminatory treatment reached a "crisis point" in the spring of 1992.[7] After the May 1990 incident, the plaintiff alleges that Mr. Dunbar's continued his disrespectful and discriminatory conduct towards her.[8] In response, the plaintiff filed informal complaints with Mr. Reese.[9] The plaintiff confronted Mr. Dunbar and accused him of being a racist.[10] Plaintiff avers that this accusation prompted an outburst from Mr. Dunbar and he raised his arm as if to strike her.[11] A meeting with Mr. Dunbar, Mr. Reese, Ms. Wilson, and Mr. Tim Sears, defendant's Union Director, was held to discuss the plaintiff's allegation. Mr. Reese, at his deposition, testified that during this meeting Ms. Wilson questioned Mr. Dunbar whether race in fact motivated his disparate treatment of the plaintiff. Mr. Dunbar allegedly replied, "Well, she's black, isn't she?"[12] Mr. Reese testified that this comment confirmed his ongoing suspicion that Mr. Dunbar exhibited prejudice towards the plaintiff.[13] The defendant attributes Mr. Dunbar's statement to his frustration and displeasure with being branded a racist by the plaintiff.[14]

Third, plaintiff relies on a reprimand that Mr. Dunbar received in the fall of 1993 for allegedly drawing swastikas on a file cabinet situated near the desk of a Jewish co-worker, his disparaging remarks associating the plaintiff with Mayor Marion Barry after his arrest for drug use, and the lack of complaints from white co-workers as evidence of Mr. Dunbar's racial animus.[15] Plaintiff also alleges that Mr. Dunbar retaliated against her for making informal complaints to her union shop steward and personnel manager in complaining of conduct she reasonably believed to be discriminatory.[16]

Finally, plaintiff points to a series of incidents in June through August 1995 that she alleges culminated in her constructive discharge from her employment. Plaintiff asserts that Mr. Dunbar isolated plaintiff's work station from the rest of her co-workers and subjected her to more frequent and intense verbal abuse and intimidation because of missing checks and missing files.[17] On July 27, 1995, plaintiff contacted Ms. Wilson regarding Mr. Dunbar's behavior and when no action was taken, she filed a grievance with her union.[18] On August 2, 1995, the plaintiff met with Ms. Wilson to discuss another incident where Mr. Dunbar yelled and screamed at the plaintiff. At this meeting, plaintiff requested a transfer to a comparable position under a different supervisor because she felt she could no longer work with Mr. Dunbar.[19] Defendant denied her transfer request. On August 18, 1995, the plaintiff again met with Ms. Wilson and sought an unpaid leave of absence due to severe stress and resulting health problems.[20] On December 20, 1995, plaintiff filed an administrative

5. Reese Memorandum, May 1990, Exhibit 1 to Plaintiff's Opposition; Plaintiff's Opposition at 2. Mr. Reese wrote this memorandum at the time of the meeting and it bears his signature and that of the plaintiff.

6. Defendant's Motion for Summary Judgment at 10–11.

7. Plaintiff's Opposition at 7.

8. Chronology of Events ¶¶ 8–9, Exhibit 1 to Plaintiff's EEOC Charge of Discrimination.

9. *Id.*

10. Plaintiff's Opposition at 7–8.

11. *Id.* at 8.

12. *Id.*

13. *Id.* at 8–10.

14. Defendant's Reply at 15.

15. Plaintiff's Opposition at 11–16.

16. *Id.* at 32–33.

17. Chronology of Events ¶¶ 13–14; Plaintiff's Opposition at 16–19.

18. Chronology of Events ¶ 14.

19. *Id.* at ¶ 15; FAC ¶ 11.

20. Chronology of Events ¶ 16.

charge of discrimination with the EEOC. The defendant formally terminated the plaintiff's employment on August 1, 1996. Subsequently, on August 13, 1996, the plaintiff filed this action.

## III. DISCUSSION

### A. Legal Standard for Summary Judgment

Fed.R.Civ.P. 56(c) provides that, "summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Rule 56(c) mandates summary judgment if a party fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In such a situation, there is no genuine issue of material fact since there is a failure of proof concerning an essential element of the non-moving party's case that renders all other facts immaterial. *Id.* at 322–323. The moving party meets its burden if it illustrates that there is an absence of evidence to support the non-moving party's case. *Id.* at 325. The party opposing a motion for summary judgment may not rely on mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

█ Credibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions. *Anderson*, 477 U.S. at 249. The court must accept the evidence of the non-movant as true, and all justifiable inferences are to be drawn in his favor. *Id.* Moreover, because discriminatory intent and proof of disparate treatment are difficult to establish, courts must view summary judgment with

special caution and therefore must be particularly careful to view all of the evidence in the light most favorable to the plaintiff. *Ross v. Runyon*, 859 F.Supp. 15, 21–22 (D.D.C.1994). If a reasonable fact finder could infer discrimination based on the evidence submitted, then summary judgment is inappropriate. *Hayes v. Shalala*, 902 F.Supp. 259, 264 (D.D.C.1995).

### B. Continuing Violation

█ Defendant argues that the plaintiff cannot base her claims of race discrimination and retaliation on events occurring in May 1990 and spring of 1992 because they fall outside of the statute of limitations. Plaintiff, however, argues that those alleged events constitute a continuing violation and thus are properly before the court. Therefore, as a threshold matter, the court must determine whether the plaintiff has established a continuing violation for claims in May 1990 and spring 1992.

A Title VII plaintiff must file an administrative charge of discrimination with the EEOC within 300 days of the "alleged unlawful employment practice." 42 U.S.C. § 2000e–5(e)(1).[21] Untimely allegations are time-barred. *DuVall v. Postmaster General, U.S. Postal Serv.*, 585 F.Supp. 1374, 1376 (D.D.C.1984), *aff'd*, 774 F.2d 510 (D.C.Cir. 1985). Recovery for acts falling outside the statute of limitations period requires the plaintiff to prove that the conduct constitutes a continuing violation of Title VII. *Palmer v. Kelly*, 17 F.3d 1490, 1495 (D.C.Cir.1994). The question of whether a violation is continuing must be addressed on a case-by-case basis. *Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). To establish a continuing violation, a plaintiff must demonstrate either "a series of related discriminatory acts, of which one or more fall within the limitations period, or the maintenance of a discriminatory system both before or during the limitations period." *Palmer*, 17 F.3d at 1495 (quoting *Berger v. Iron Workers Reinforced Rodmen Local 201*,

**21.** Plaintiff sets forth claims under Title VII, Section 1981, and the DCHRA. Because claims arising under Section 1981 and the DCHRA borrow from Title VII jurisprudence, each claim will be addressed in the Title VII context to the extent it is analogous for each cause of action. *See Hodges v. Washington Tennis Serv. Int'l*, 870 F.Supp. 386, 387 n. 1 (D.D.C.1994).

843 F.2d 1395, 1422 (D.C.Cir.1988); *Albritton v. Kantor,* 944 F.Supp. 966, 970 (D.D.C. 1996)). In addition, a plaintiff must show a nexus between the untimely filed claim and the claim that is timely filed. *Albritton,* 944 F.Supp. at 970. Therefore, in analyzing a claim of continuing violation of Title VII, the court must make two determinations. First, the court must ascertain whether an actual violation of Title VII occurred during the statutory period. *Palmer,* 17 F.3d at 1496 (stating that "emphasis should not be placed on mere continuity: the critical question is whether any present violation exists") (citing *United Air Lines v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977)). Second, the court must then determine whether the discriminatory conduct was part of a pattern or series of related discriminatory acts, or was caused by a discriminatory system in effect both before and during the statutory period. *Id.* at 1496. Here, the defendant does not contest that the plaintiff satisfies the first element because she timely filed an EEOC administrative charge with regard to the alleged discriminatory events occurring in June through August 1995. The more difficult question for the court is whether the plaintiff can establish a nexus between untimely filed claims occurring in May 1990 and the spring of 1992, and the timely filed claims occurring in June through August 1995.

To determine whether a nexus exists between the untimely claims and those filed within the statute of limitations, courts widely use a three-part test set forth in *Berry v. Board of Supervisors of LSU,* 715 F.2d 971, 981 (5th Cir.1983). The three factors include: (1) the subject matter or type of discrimination; (2) the frequency of the acts; and (3) the degree of permanence of the alleged misconduct. *See Berry,* 715 F.2d at 981. This last factor examines whether the acts possess a degree of finality that would alert an employee of a need to assert his or her rights. *Id.* If the employee could not have perceived the discrimination until a ser-

ies of acts occurred, then the employee should be able to plead the earlier, time-barred claim. *Id.*

The permanence factor requires that an employee sue as soon as harassment becomes sufficiently palpable that a reasonable person would realize she had a Title VII claim. *Galloway v. General Motors Serv. Parts Operations,* 78 F.3d 1164, 1166 (7th Cir.1996). This factor takes into account that a plaintiff subjected to a hostile work environment may not be immediately alerted to the fact that the defendant's conduct is actionable because conduct that creates an offensive or hostile environment generally does not have the degree of permanence as, for example, the loss of a promotion. *Waltman v. International Paper Co.,* 875 F.2d 468, 476 (5th Cir.1989). Nonetheless, a plaintiff may not reach back and base her suit on conduct that occurred outside the statute of limitations unless it would be unreasonable to expect the plaintiff to sue before the statute ran on the alleged discriminatory conduct. *Galloway,* 78 F.3d at 1167. For example, if the conduct could be recognized as actionable harassment only in light of the events that occurred later within the statute of limitations, a continuing violation may be found. *Id.* A claim that is continuing only because a putative plaintiff knowingly fails to seek relief earlier is exactly the sort of claim Congress intended to bar with the statute of limitations period. *Sabree v. United Brotherhood of Carpenters,* 921 F.2d 396, 402 (5th Cir.1990).

In this case, it is the permanence factor that undermines the plaintiff's theory of a continuing violation. The record indicates that the plaintiff had definite knowledge of the defendant's alleged discriminatory conduct as early as May 1990, but knowingly failed to bring suit. Indeed, plaintiff admits in her responses to defendant's interrogatories that she was aware of the defendant's alleged misconduct and actually notified defendant's management of the racially discriminatory conduct.[22] Furthermore, plain-

---

22. 10. STATE the date YOU first ... became aware that ... UBC was engaging in the unlawful conduct underlying the violations alleged ... INCLUDING a DESCRIPTION of the incidents [sic] involved.

**Response:** *Some time before the meeting of May 10, 1990* involving Barbara Wilson, Timothy Dunbar, Fred Reese and plaintiff, Mr. Dunbar screamed loudly at plaintiff to return to her desk until precisely 10:00 a.m. before taking a

tiff conceded in her affidavit that she "worked at [defendant] UBC for a *long time* in spite of abusive conduct from Mr. Dunbar that [she] *thought was racially motivated.*" [23] According to the plaintiff's admissions, she knew of the discrimination and recognized the need to assert her rights more than five years before she filed an EEOC charge of discrimination in December 1995.[24]

■ Based on her admissions, it is clear to the court that the plaintiff realized the racially hostile environment was permanent in nature. Under these circumstances, the plaintiff may not rely on a continuing violation theory to base her discrimination and retaliation claims on events that occurred in May 1990 and spring of 1992. *See Sabree,* 921 F.2d at 402 (holding that when plaintiff admits knowledge of discriminatory conduct, theory of continuing violation must fail). For each remaining claim alleged, the plaintiff is limited to conduct that occurred within the applicable statute of limitations.[25] Specifical-

ly, the plaintiff may not rely on events occurring prior to August 13, 1993, to assert her claims of race discrimination and retaliation. The court, therefore, grants defendant's motion for summary judgment on the continuing violation claim.[26]

## C. Race Discrimination

■ The plaintiff alleges that Mr. Dunbar's discriminatory and disparate treatment of her resulted in a racially hostile work environment. Title VII prohibits an employer from creating or condoning a discriminatorily hostile or abusive work environment. *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).[27] "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris*

coffee break, while saying nothing to a colleague who had also left the office with plaintiff a minute or so before the hour.
11. STATE the first date YOU notified the UBC that ... it was engaging in the unlawful conduct allege [sic] ... AND DESCRIBE the details of that notice.
**Response:** *On or about May 10, 1990* plaintiff informed Barbara Wilson, defendant's Personnel Manager, that Mr. Dunbar was subjecting her to abusive conduct, and that she believed it was motivated by her race and sex.
Plaintiff's Responses to Defendant's First Set of Interrogatories 10, 11 (emphasis added).

**23.** Villines Affidavit ¶ 6 (emphasis added).

**24.** Some courts make a distinction between a plaintiff's realization that she is being discriminated against and the realization that there is a duty to file a charge with the EEOC. *Lowery v. Carrier Corp.,* 953 F.Supp. 151, 158 (E.D.Tex. 1997). In this case, Villines was aware of both the discriminatory conduct and her statutory right to complain of unlawful employment practices. In May 1990, spring of 1992, and on subsequent occasions, plaintiff made several complaints to her union shop steward and informed defendant UBC's Personnel Manager of Mr. Dunbar's discriminatory conduct. This fact alone demonstrates that she has knowledge of her right to oppose unlawful conduct.

**25.** Title VII requires that a charge be filed within 300 days of the alleged discriminatory conduct. 42 U.S.C. § 2000e–5(e)(1). The time for filling a discrimination charge under the DCHRA is one year. D.C.Code § 1–2544(a). For claims brought

pursuant to Section 1981, however, there is no requirement to file an administrative charge and the statute of limitations is measured from the date the suit is filed. The D.C. Circuit has applied the District Columbia's three-year personal injury statute of limitations to Section 1981 claims instead of the one-year statute of limitations embodied in the DCHRA. *See Harris v. Perini,* 948 F.Supp. 4, 6 (D.D.C.1996) (citing *Banks v. Chesapeake & Potomac Tel. Co.,* 802 F.2d 1416 (D.C.Cir.1986)). In this case, conduct occurring during the three years preceding plaintiff's August 13, 1996 filing date is appropriately before the court under the Section 1981 claims.

**26.** The court's elimination of these *untimely* events does not preclude their admissibility in later proceedings. The Supreme Court has held that time-barred acts "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue," although they can create no present legal consequence. *Evans,* 431 U.S. at 558; *see also Sabree,* 921 F.2d at 401–402 (citing *Evans*).

**27.** Title VII makes it an unlawful employment practice for an employer to "discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or nation of origin." 42 U.S.C. § 2000e–2(a)(1). As made clear in *Meritor,* the language "terms, conditions, or privilege" is not limited to economic or tangible discrimination and may include psychological harm. *Meritor,* 477 U.S. at 64.

*v. Forklift Sys., Inc.,* 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quotation omitted). A hostile work environment may be abusive to employees because of their race, gender, religion, or national origin. *Park v. Howard Univ.,* 71 F.3d 904, 906 (D.C.Cir.1995) (quoting *Harris,* 510 U.S. at 23). Conduct that does not create hostile or abusive environment is beyond the purview of Title VII. *Harris,* 510 U.S. at 21.

To establish a claim of hostile work environment, a plaintiff must demonstrate "(1) that he or she suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of *respondeat superior* liability." *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1081 (3d Cir.1996). A finding of a hostile work environment depends on the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance. *Harris,* 510 U.S. at 23. The harassment need not be racial in content to create a racially hostile work environment, rather it must be shown that "had the plaintiff been white she would not have been treated in the same manner." *Aman,* 85 F.3d at 1083.

In this case, interpreting all facts in the light most favorable to the plaintiff, the court finds that the plaintiff produced sufficient evidence upon which a reasonable jury could conclude that she was subjected to pervasive and severe discriminatory working conditions. Indeed, the plaintiff offers four separate incidents occurring from June through August 1995 when Mr. Dunbar allegedly chastised and mistreated her.[28] The first incident involved several checks that were stolen from the plaintiff's desk drawer. The plaintiff alleges that Mr. Dunbar yelled at her and blamed her for the stolen checks. The second episode involved Mr. Dunbar ordering several file cabinets be placed in front of the plaintiff's desk. These file cabinets blocked her view to her colleagues and visitors entering the office. The final two incidents concerned missing files. The plaintiff alleges that on two separate occasions Mr. Dunbar yelled at her when he could not locate his files; however, in one instance, the file was in fact found in his office. The plaintiff alleges that the cumulative impact of these four incidents taxed her emotional, psychological, and physical well being. The plaintiff claims that her experience resulted in so much stress that her primary care physician recommended that she seek psychological evaluation. Furthermore, the plaintiff avers that none of the white co-workers under Mr. Dunbar's supervision received the same frequent and hostile treatment.[29]

Discriminatory intent and disparate treatment in employment discrimination cases are difficult to prove. *Ross,* 859 F.Supp. at 21–22. Therefore, the court must consider the plaintiff's allegations in the totality of circumstances. *Harris,* 510 U.S. at 23. In this regard, the court concludes that, given the frequency and pervasiveness of the alleged misconduct, a reasonable jury could infer discrimination based on the plaintiff's race from these facts. Indeed, a reasonable jury could find that had the plaintiff been white, as her co-workers were, Mr. Dunbar would not have singled her out and subjected her to harassment. Accordingly, the court concludes that the plaintiff satisfied her burden in establishing a hostile work environment and denies defendant's motion for summary judgment on these claims.

## D. Constructive Discharge

█ Plaintiff Villines alleges that six years of employment in a racially hostile work environment created intolerable conditions that operated to constructively discharge her from her job. For a plaintiff to recover on a constructive discharge theory she must show (1) the existence of intentional discrimination, (2) that the employer "deliberately made working conditions intolerable and drove the employee into an involuntary quit," and (3) that the constructive discharge was justified

---

**28.** Plaintiff's Opposition at 16–19.

**29.** *Id.* at 15–16.

by the existence of aggravating factors. *Clark v. Marsh*, 665 F.2d 1168, 1173–74 (D.C.Cir.1981) (internal modifications and citation omitted); *see also Bishopp v. District of Columbia*, 788 F.2d 781, 790 (D.C.Cir. 1986). This inquiry focuses on whether the employer "creates or condones discriminatory working conditions that would drive a reasonable person to resign." *Katradis v. Dav–El*, 846 F.2d 1482, 1485 (D.C.Cir.1988) (citation omitted).

A finding of intentional discrimination is a necessary predicate for a finding of constructive discharge. *Bishopp*, 788 F.2d at 790. Here, because both the plaintiff's claims of constructive discharge and hostile work environment require a finding of intentional discrimination, the viability of the constructive discharge claim is inextricably linked to the hostile work environment inquiry. As reasoned above, the plaintiff carried her burden of establishing alleged intentional discrimination on the basis of race. The plaintiff also produced evidence to demonstrate that a reasonable jury could find her working conditions intolerable as to cause her to take unpaid medical leave. Indeed, the plaintiff described how these four harassing incident affected her physical, psychological, and emotional state to the point where her physician suggested that she seek therapy. For these reasons, the court concludes that a reasonable jury could infer that these alleged incidents constitute aggravating factors which contributed to her constructive discharge. Accordingly, the court denies the defendant's motion for summary judgment on the plaintiff's constructive discharge claims.

### E. Retaliation

■ Plaintiff Villines alleges that the defendant retaliated against her for filing informal complaints with defendant's management. Plaintiff further alleges that defendant's retaliation contributed to her constructive discharge.[30] Title VII prohibits an employer from discriminating or retaliating against an employee because he or she has opposed an unlawful employment practice. 42 U.S.C. § 2000e–3(a). To establish a prima facie case of retaliation, a plaintiff must demonstrate that (1) she was engaged in a protected activity, (2) she was subjected to adverse action by the employer, and (3) there existed a causal link between the adverse action and the protected activity. *Thomas v. National Football League Players Ass'n*, 131 F.3d 198, 202 (D.C.Cir.1997).

In this case, a threshold matter is whether plaintiff had engaged in an activity protected by Title VII. The plaintiff claims that the informal complaint she lodged in the spring of 1992 constitutes a protected activity.[31] Specifically, plaintiff alleges that her complaint to her union shop steward and personnel manager infected Mr. Dunbar's racially hostile misconduct with retaliatory animus.[32] Plaintiff, however, may not rely on the informal complaint in the spring of 1992. As discussed above, the plaintiff fails to establish a continuing violation of Title VII and thus cannot salvage untimely filed claims. Therefore, she cannot reach back and rely on conduct outside the statutory limitations to serve as the basis for her retaliation claim. *See Galloway*, 78 F.3d at 1167.

■ The plaintiff, however, also filed informal complaints on July 27 and August 2, 1995, complaining of incidents where Mr. Dunbar yelled, cursed, and screamed at the plaintiff.[33] These informal complaints constitute protected activity for purposes of alleging retaliation under Title VII. *See Thomas*, 131 F.3d at 206 (finding that conversations regarding discrimination against women and African–Americans constitute an informal complaint). Furthermore, the plaintiff has

---

30. Plaintiff does not argue that her termination from UBC was a form of retaliation. Rather, "the only retaliation claims plaintiff advances at this point are founded on a constructive discharge theory." Plaintiff's Opposition at 31 n. 30.

31. FAC ¶ 9; Plaintiff's Opposition at 32–33. Defendant does not dispute that informal com-

plaints constitute opposition to unlawful employment practices under Title VII. Defendant's Motion for Summary Judgment at 23.

32. *Id.*

33. Chronology of Events ¶¶ 14–15.

suffered an adverse personnel action when the defendant failed to transfer her to another department. The D.C. Circuit has broadly defined adverse personnel action as any employment decision taken by the employer regardless of whether that decision adversely affects the promotion or causes other tangible or economic loss. *Palmer v. Shultz,* 815 F.2d 84, 97–98 (D.C.Cir.1987). Under *Palmer,* the defendant's failure to transfer the plaintiff out of her abusive working environment can be seen as an adverse personnel action. This failure to transfer required the plaintiff to continue working in a hostile environment, which ultimately led to her constructive discharge.

Finally, the plaintiff produced facts to establish the existence of a causal connection between her protected activity and the adverse action. "'The causal connection component of the prima facie case may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after the activity.'" *Hayes v.. Shalala,* 902 F.Supp. 259, 264 (D.D.C.1995) (quoting *Mitchell v. Baldrige,* 759 F.2d 80, 86 (D.C.Cir.1985)). Here, the record indicates that the defendant had actual knowledge of the plaintiff's protected activity because she filed several complaints with the defendant's management. Subsequent to these complaints, the defendant declined to transfer her out of her the abusive environment. Plaintiff alleges that this environment resulted in her constructive discharge from her employment. Given these facts, a reasonable jury could infer a causal link between her filing of complaints and the defendant's alleged adverse action against her. Accordingly, the court concludes that the plaintiff met her prima facie burden and denies defendant's motion for summary judgment on the retaliation claims.

## IV. CONCLUSION

For the reasons stated above, the court grants Defendant's Motion for Summary Judgment in part and denies it in part.

Accordingly, it is this 31st day of March, 1998,

**ORDERED** that Defendant's Motion for Summary Judgment, or in the alternative, Motion for Summary Adjudication be and is hereby **GRANTED** in part and **DENIED** in part; it is

**FURTHER ORDERED** that Defendant's Motion to Strike Portions of Plaintiff's Affidavits be and is hereby **DENIED**; it is

**ORDERED** that Plaintiff's Motion for Leave to File Supplemental Memorandum in Opposition to Defendant's Motion for Summary Judgment be and is hereby **GRANTED** *nunc pro tunc;* it is

**ORDERED** that Defendant's Motion for Order to Show Cause Re Contempt for Failure to Comply with Subpoena be and hereby is **DENIED**; and it is

**ORDERED** that the above-captioned case is scheduled for a status hearing on **April 14, 1998, at 11:00A.M. E.S.T.**

**SO ORDERED.**