94 Cal.Rptr.2d 228 (2000)
79 Cal.App.4th 570
Lachi Delisa RICHARDS, Plaintiff and Respondent,
v.
CH2M HILL, INC., Defendant and Appellant.
No. C027848.
Court of Appeal, Third District.
March 30, 2000.
As Modified on Denial of Rehearing May 1, 2000.
Review Granted June 28, 2000.
*230 Seyfarth, Shaw, Fairweather & Geraldson, Mark H. Van Brussel and Mark P. Grajski, Sacramento; Sherman & Howard, and Theodore A. Olsen, Denver, CO, for Defendant and Appellant.
Christopher H. Whelan, Inc., Gold River, Law Offices of Ellen Lake, and Ellen Lake, Oakland, for Plaintiff and Respondent.
KOLKEY, J.
A jury awarded $1.4 million to plaintiff Lachi Richards against her former employer, defendant CH2M Hill, Inc., for disability discrimination in violation of the Fair Employment and Housing Act (FEHA or Act) (Gov.Code, § 12900 et seq.). Most of the acts of discrimination upon which her claims were based, however, occurred outside of the one-year statute of limitations set forth in the Act, which requires that an employee file an administrative complaint within "one year from the date upon which the alleged unlawful [employment] practice .... occurred, except that this period may be extended ... for not to exceed 90 days ... if a person allegedly aggrieved ... first obtained knowledge of the facts of the alleged unlawful practice after the expiration of one year from the date of their occurrence...." (Gov.Code, § 12960.) The trial court ruled that the "continuing violation" doctrine permitted plaintiff to assert all of her claims arising over a five-year period.
We conclude that a series of claims that an employee knowingly permits to expire cannot be revived by characterizing them singularly as a "continuing violation" once a new claim arises within the limitations period. The view that a timely claim can resuscitate expired claims simply cannot be reconciled with the distinctive language of the one-year statute of limitations here, which only offers a limited, 90-day grace period in those instances where the aggrieved party did not have knowledge of the facts of the alleged unlawful practice. Instead, as explained herein and consistent with the weight of federal authority, we conclude that the continuing violation doctrine, where it is premised on a series of discrete, discriminatory acts (as here) and not on an express policy of the employer, can only be reconciled with the one-year limitations period if the discriminatory nature of the acts was not cognizable when they were committed but became so when viewed cumulatively in light of later acts committed during the actionable period. In essence, the continuing violation doctrine allows an employee to reach back and premise liability on acts that occurred, in part, outside of the limitations period only because it is the cumulative nature of the allegedly discriminatory acts which gives rise to a cognizable unlawful employment practice within the actionable period, as in the case of a hostile work environment claim. However, the continuing violation doctrine is not a doctrine of continued violations by which the most ancient claims can hijack more recent claims to ride through the courtroom door in the face of statutory language that bars claims that knowingly occurred outside the one-year limitations period.
Accordingly, we reverse the judgment, and remand to the trial court for proceedings consistent with this opinion.

I. FACTUAL AND PROCEDURAL BACKGROUND
Plaintiff was hired by defendant, a nationwide engineering firm, as a civil engineer and began work in 1984 in the water *231 resources division at its Redding office. By all accounts, plaintiff was an outstanding engineer, who consistently generated favorable performance evaluations.
In late 1987, however, plaintiff began experiencing tremors and difficulty walking. Although she could still walk, plaintiff began using a wheelchair in April 1988 as a means of conserving energy. In October 1988, plaintiff was diagnosed with multiple sclerosis (MS).[1] Plaintiffs supervisors agreed to her request that she be given a part-time schedule, that she not be required to perform any fieldwork, and that she be permitted to work out of the Sacramento office.
Plaintiffs symptoms continued to worsen. On her doctor's advice, plaintiff took an indefinite leave of absence, which ultimately lasted 10 months, beginning in March 1989.
On January 2, 1990, plaintiff returned to work in the Sacramento office. As her condition improved, plaintiff eventually worked an average of 20 to 25 hours per week. Plaintiff performed some of her work at the office and some of her work at homea routine that continued until February 1993, when plaintiff tendered her resignation.
Both before and after plaintiff was diagnosed with MS, a number of issues arose regarding defendant's accommodation of plaintiffs disability. We summarize these issues below.[2]

A. Plaintiff's transfer
When plaintiff commenced her 10-month leave of absence in March 1989, she requested a formal transfer from the Redding office to the Sacramento office, both because it offered her closer proximity to her doctors, and because the Redding office was not wheelchair accessible.
Although the transfer approval process normally takes 60 to 75 days, approval of plaintiffs transfer took 11 months. It was not formally approved by the regional district manager, Robert Harding, until February 1990one month after plaintiffs return from her leave of absence. Despite this delay, however, plaintiff reported to work at the Sacramento office when she returned from her leave on January 2, 1990and in fact, had been working there prior to her leave of absence.
Plaintiffs evidence suggested that the approval of her transfer was delayed primarily because Harding believed plaintiff had lied on her employment application about her medical condition. Harding was not inclined to accommodate an employee whose candor he questioned, a viewpoint he unhesitatingly expressed to some of the supervisors in the Redding and Sacramento offices. In 1990, Mike Kashiwagi, the civil department manager, told plaintiff that despite her good work, Harding and those in the corporate office wanted plaintiff to quit.

B. Computer Issues
During her 10-month leave of absence, plaintiff undertook to teach herself new computer software. To assist plaintiff in this endeavor, Grant Davids, plaintiffs Sacramento office supervisor, would bring a company computer to her home on the weekends. In August 1989, plaintiff asked Davids if the company would loan her a computer to keep at home following her return to work.
Davids informed her that defendant was not likely to loan her a computer and encouraged her to buy her own. He did, however, give his approval to plaintiff to *232 work at home part-time following her return from her leave of absence.
Plaintiff proceeded to contact the California Department of Rehabilitation and several private organizations, seeking funding to purchase a computer. When two private organizations distributed flyers asking for contributions in plaintiffs name and identifying defendant as her employer, plaintiffs other supervisors told her that the solicitations had embarrassed the company. Plaintiff was requested to ask the private organizations to withdraw the solicitations.
In November 1989, at the urging of one of defendant's managers, plaintiff met with Stan Smith, the Redding regional manager, to seek authorization to perform computer work at her home and to ask that defendant provide her with a computer. Smith told plaintiff that while the company was not asking her to resign, it was having difficulty comprehending how it could accommodate her disability. By the end of the meeting, Smith told plaintiff that the Sacramento office would have to make the decision on the computer.
In fact, plaintiff never received an answer. As a result, in December 1989 while still on her leaveplaintiff informed defendant it "no longer need[ed] to consider the issue of providing [her] with a computer" because she had secured funding assistance from the Department of Rehabilitation. Plaintiff then purchased her own computer.
During the August-December 1989 period in which plaintiff was seeking a computer, plaintiff sought legal advice from a lawyer and a private organization which advocates for the disabled, Resources for Independent Living, in an effort to determine whether her computer request was "reasonable," as well as to determine her rights in general to "reasonable accommodation" under the law.[3]

C. The Lot
In November 1988, while she was already working out of the Sacramento office, plaintiff, acting on her doctor's advice, requested Carol Uhouse, the regional administrative manager responsible for facilities in the Sacramento office, to purchase a bed so that she could rest during the day.
Instead of purchasing a bed, the company purchased a folding army cot. Uhouse insisted that plaintiff help pay for items such as a mattress and sheets, while the company paid for blankets and a pillow.
Uhouse vetoed plaintiff's request that the cot be placed in any of several vacant offices, believing that the cot would be visible to, and look unprofessional to, clients and other visitors. Uhouse suggested that the cot be placed in an unheated and uncooled storage area known as the "black hole." Plaintiff vetoed that suggestion.
Following plaintiff's return from her leave of absence in January 1990, the cot was set up in a drafting room next to plaintiffs office. However, Uhouse would periodically move the cot without notice when the space was needed for other purposes. The musical-cot scenario continued until the spring or summer of 1990, when plaintiffs department manager, Loren Bottorff, moved the cot to a vacant office next to a new office into which plaintiff had recently moved.
Plaintiff considered the new location unsatisfactory, primarily because the room had a pole in the middle that prevented her from closing the door if her wheelchair was in the room. However, from that point forward, plaintiff dropped the cot issue and would go home whenever she needed to rest.[4]

D. Location of Plaintiff's Office
Upon plaintiffs return from her leave of absence, Uhouse led plaintiff past her old *233 officewhich remained intact, with all of her personal belongings still insideto the back of a "storage/layout kind of all-purpose junk room area" where there was nothing but a rug, and pointed to the area, stating, "`This is your office.'" One of the engineers was asked to put a desk together for plaintiff; plaintiff "found" a telephone; and various co-workers and friends assisted plaintiff in furnishing and arranging her "storage room" office.
Two days later, plaintiff returned to her old office. Another employee had moved into it. All of plaintiff's personal items were gone. It took several weeks for plaintiff to regain her property. Even then, some of the items, such as design manuals and books, were missing.
According to plaintiff, Davids remarked that Uhouse put plaintiff's office in the "storage area" because Uhouse thought plaintiff "was milking the company and milking people because [plaintiff] had MS; that [plaintiff] was trying to get sympathy from people by asking for the computer; ... [and that Uhouse] felt that the company was bending over backwards to let [plaintiff] in the door, and ... was not going to do another thing for [plaintiff]." Davids suggested that plaintiff meet with Uhouse in an effort to improve their relationship.
In any event, within six months (i.e., by June 1990), plaintiff moved into a new office in the water resources area of the building. Uhouse had approved the move.

E. Plaintiff's Meeting in January 1990 to Request Reasonable Accommodation
In January 1990, plaintiff prepared a document which discussed why she wanted her own computer and which requested "accommodations in the area of a flexible time schedule" and permission "to work partially at home."
Plaintiff then met with Uhouse and Steve DeCou, the Sacramento office manager. DeCou and Uhouse rejected plaintiffs request that she be allowed to work part-time at home. Despite the lack of working part-time at home, and in October/November 1990, plaintiffs department manager, Loren Bottorff, gave plaintiff permission to do so.

F. Access Issues

1. Office Doors
Shortly after plaintiff returned from her leave in January 1990, she complained to Uhouse that some of the doors in the building were hard to open and asked that they be adjusted. Uhouse said that she would take care of the problem. She did not.
The following month, February 1990, plaintiff took care of the problem with the assistance of her boyfriend and other friends.

2. Gary Dobson's Furniture and Equipment
From January to June 1990, plaintiff had a problem maneuvering her wheelchair into her office because of furniture and equipment kept in the hallway by Gary Dobson, the surveying department manager. Plaintiff requested Dobson to move the offending items. He refused. Whenever plaintiff moved the items herself, Dobson would move them back. The problem continued until June 1990, when plaintiff was relocated to her new office in the water resources area.

3. Plaintiff's October 1990 Memo to Uhouse Concerning Access
On October 3, 1990, plaintiff wrote a memo to Uhouse, complaining about various impediments to her access within the office.

a. The Reception Area Door
Plaintiff accessed defendant's offices through a particular reception area door. In September 1990, Uhouse made a decision to keep it closed because the receptionist claimed that she could not do her job over the noise of a nearby mailroom.
*234 Plaintiff's October 1990 memo requested that the door be kept open during plaintiff's work hours. It appears from that point forward, the door was, for the most part, kept open during the hours requested by plaintiff. The issue was never raised again.

b. The Wheelchair Ramp
Beginning with her use of a wheelchair in April 1988, plaintiff had a problem traversing the wheelchair ramp leading to defendant's offices. Whenever it rained, when the lawns were watered, or when the water fountain at the top of the ramp overflowed, the ramp would become slippery, causing plaintiffs manual wheelchair to hydroplane. On such occasions, it was necessary for plaintiff to muscle her way up or get a "running start."
In her October 1990 memo to Uhouse, plaintiff suggested that non-skid tape be applied to the ramp. In the alternative, she suggested that drainage grooves be cut into the ramp.
In October or November 1990, the building handyman applied a substance to the ramp in an effort to improve traction, but the fix was ineffectual. Plaintiff continued to raise the issue with Uhouse, but the ramp was never modified to plaintiffs satisfaction.
In January or February 1991, however, plaintiff began using a power wheelchair, which was unaffected by the wet conditions on the ramp.

c. The Building Elevator
In her October 1990 memo to Uhouse, plaintiff complained that "[t]he wheels of the wheelchair catch on the lip of the elevator floor[,] which slows [her] entrance into the elevator [such] that the doors close on [her] arms." Despite plaintiffs request that the elevator doors be fitted with an electronic eye, or that the time be lengthened for the doors to remain open, the problem was never fixed.

d. The Lunchroom
In her October 1990 memo, plaintiff complained that "[t]he vending machines and southern counter area in the lunch room [sic] are not useable without my rearranging the tables and chairs each day."
In December 1991, another problem arose: The vending machines blocked plaintiffs access to the microwave, which had been moved to the back of the lunchroom and which plaintiff needed to warm up a special lunch prescribed by her physician.
In response to plaintiffs complaints, Uhouse moved one of the vending machines into a nearby hallway in order to give plaintiff access to the back of the room, including the microwave.
However, the subsequent addition of recycling bins once again prevented plaintiff from accessing the microwave oven. Plaintiff testified that her fellow employees would help her with the microwave.
Plaintiff's access to the microwave was finally resolved in January 1993, when the microwave was moved to a different location.

e. Library Access
When plaintiff first started using a wheelchair in April 1988, she could access the entire Sacramento office library, except for two stacks that were too close together. In 1990, a microfiche machine was added, cutting off wheelchair access to all of the stacks. Plaintiff mentioned the problem in her October 1990 memo.
However, in mid-1992, the library was relocated, and access was no longer a problem for plaintiff.
Nonetheless, the new library location did make it difficult for plaintiff to do a U-turn in her wheelchair to escape in case of a fire. Plaintiff complained to Loren Bottorff about the problem, but he told her that "`[n]othing ... can be done.'"

f. Supply Room Access
Plaintiff's October 1990 memo noted that it was difficult for her to access pens, pencils, and paper in the supply room.
*235 The problem continued for several months, until the supply room was moved to a different location. However, the new location was effectively inaccessible because it required plaintiff to negotiate two 90-degree turns in her wheelchair. Plaintiff further testified that there were no "clerical or staff people" who could get her the supplies that she needed.
Sometime in 1991, plaintiff requested that the supply room be rearranged, giving her access to those supplies that she needed on a frequent basis. Her suggestion was never acted upon.

g. Hallway Access
Plaintiff also complained in her October 1990 memo that boxes, furniture, and equipment in the hallways made wheelchair access difficult. In some areas, plaintiff would scrape her elbows against boxes piled up along the corridor, causing the boxes to fall on her. In other areas, it was difficult, if not impossible, for plaintiff to turn her wheelchair around. Plaintiff asked that the hallways have at least 36 inches of clear space, and that corners have at least 45 inches of clearance.
Access to an upstairs hallway, which was also impeded, was particularly important to plaintiff because she needed access to the word processing and draft and computer services there "every day that [she] was at work."
No changes were made until 1993.

G. Events in 1992
In January 1992, during her annual performance evaluation, plaintiff complained about various access problems and about the difficulty of obtaining timely and correct W-2 forms. According to plaintiff, department manager Loren Bottorff told her that she was facing a "brick wall" and that "nothing [was] going to change."[5]
Plaintiff thereafter missed work for a month following a car accident in February 1992, and took two weeks off in June 1992 to get married.
After plaintiff returned in July 1992, her symptoms worsened to the point where she was unable to walk, to move her fingers or hold a pencil, or even to raise her left arm off her lap.
Using her vacation time and sick leave, plaintiff took off from work between August 1 and November 18, 1992. When she returned, she worked a schedule varying from nine to twenty hours per week.

H. Events Within the Limitations Period
On or around January 27, 1993, plaintiff and the department manager, Bottorff, met for her annual evaluation. At the meeting, plaintiff submitted typewritten comments (the typewritten comments), which raised several "administrative items" that "displeased" her: Plaintiff had been unable for the past three years to get a timely and correct W-2 form[6]; her wheelchair access in the hallways was restricted due to the constant accumulation of furniture and boxes; the disabled access ramps were often blocked by delivery trucks; and defendant had not yet established an adequate fire escape plan for plaintiff.
That same day, Bottorff gave plaintiffs typewritten comments to human resources administrator Kathy Metzger. Metzger immediately proceeded to address and resolve plaintiff's concerns. Between January 27 and February 8, 1993, Metzger reported to plaintiff almost daily on the progress made on plaintiff's complaints.
*236 Metzger made sure the caterer and post office were contacted and directed not to block the ramps. She formed a committee to develop a fire escape plan for plaintiff, and contacted the building owner to see if an additional wheelchair ramp could be built outside the exit near plaintiffs office. She directed plaintiff to point out the areas where access was a problem, and moved the offending items, i.e., bookcases and other furniture. Finally, Metzger began contacting various people in the corporate office and elsewhere in an effort to resolve the problems associated with plaintiffs W-2 form.
By February 8, when plaintiff began a two-week leave, all of the issues plaintiff had raised in her typewritten comments either had been or were in the process of being resolved.
When plaintiff returned to work on February 22, 1993, she submitted her resignation effective March 8, 1993. Plaintiff testified that she resigned because she believed that all of the events over the previous four years had had a negative impact on her health: "[J]ust the accumulation of just so many things, it was justit was unbearable for me. I could not work there any longer." Plaintiff continued: "I knew my health was on the line. I was risking my health, permanent damage to my health."

I. The Institution of Plaintiffs Claims
Plaintiff filed her administrative complaint with the California Department of Fair Employment and Housing (the Department) on January 25, 1994. Plaintiff elected to proceed with a civil action, and the Department issued plaintiff a right-to-sue letter.
Plaintiff then filed this civil action against defendant. At the commencement of trial, plaintiffs claims were (1) disability harassment under the FEHA, (2) disability discrimination under the FEHA, (3) constructive discharge in violation of public policy, and (4) intentional and negligent infliction of emotional distress.
A six-week jury trial commenced on June 2, 1997. Late in the trial, plaintiff dismissed her constructive discharge claim and her claims for intentional and negligent infliction of emotional distress. Based on the trial court's ruling that defendant's conduct constituted a "continuing violation," plaintiff was permitted to introduce evidence of, and seek damages for, the entire five-year period (1988-1993) of alleged harassment and discrimination.
Finding defendant had discriminated against plaintiff, both in creating a hostile work environment and in failing to reasonably accommodate plaintiffs disability, the jury awarded plaintiff $925,000 in emotional distress damages and $476,000 in economic damages.
Defendant moved unsuccessfully for judgment notwithstanding the verdict and for a new trial. This appeal follows.

II. DISCUSSION

A. Introduction
The FEHA prohibits both harassment and discrimination in employment on account of, inter alia, physical disability. (Reno v. Baird (1998) 18 Cal.4th 640, 644, 76 Cal.Rptr.2d 499, 957 P.2d 1333; Janken v. GM Hughes Electronics (1996) 46 Cal. App.4th 55, 62, 53 Cal.Rptr.2d 741.)[7]
*237 However, before an employee may maintain a civil action for harassment or discrimination under the FEHA, the employee must exhaust the administrative remedy provided by the FEHA by filing an administrative complaint with the Department and obtaining the Department's notice of the right to sue. "The timely filing of an administrative complaint, and exhaustion of that remedy, is a prerequisite to maintenance of a civil action for damages under the FEHA." (Balloon v. Superior Court (1995) 39 Cal.App.4th 1116, 1120, 46 Cal.Rptr.2d 161; accord, Martin v. Lockheed Missiles & Space Co. (1994) 29 Cal.App.4th 1718, 1724, 35 Cal. Rptr.2d 181; see Gov.Code, §§ 12960, 12965, subd. (b).)
Such an administrative complaint must be filed within one year of the "date upon which the alleged [unlawful employment practice(s)] occurred." (Accardi v. Superior Court (1993) 17 Cal.App.4th 341, 349, 21 Cal.Rptr.2d 292 (Accardi); Gov.Code, § 12960.)
Since plaintiff filed her administrative complaint on January 25, 1994, the one-year limitations period allowed her to claim discrimination or harassment for any unlawful practices that occurred on or after January 25, 1993.[8]
However, the core of plaintiffs claims arise before January 25, 1993. Defendant argued both before and during trial that plaintiff could not base her statutory claims on events occurring more than one year prior to the filing of her FEHA complaint. Plaintiff argued, and the trial court agreed, that the events occurring more than one year prior to the filing of her complaint were part of a "continuing violation" or pattern of unlawful conduct and therefore were properly a basis for her claims.

B. Government Code section 12960
At all times relevant to this appeal Government Code section 12960 stated in part:
"No complaint [by any person claiming to be aggrieved by an alleged unlawful employment practice] may be filed after the expiration of one year from the date upon which the alleged unlawful practice or refusal to cooperate occurred; except that this period may be extended for not to exceed 90 days following the expiration of that year, if a person allegedly aggrieved by an unlawful practice first obtained knowledge of the facts of the alleged unlawful practice after the expiration of one year from the date of their occurrence."[9] (Stats.1982, ch. 1193, § 3, p. 4260; italics added.)
*238 Hence, the limitations period under the FEHA is clear: "No complaint" may be filed after the expiration of one year from the date upon which the alleged unlawful practice occurred, but where the aggrieved person first obtained "knowledge of the facts of the alleged unlawful practice after the expiration of one year," the period can be extended "not to exceed 90 days following the expiration of that year."
While "[o]rdinarily limitations statutes use fairly simple language, which can often plausibly read as containing an implied 'equitable tolling' exception" (United States v. Brockamp (1997) 519 U.S. 347, 350, 117 S.Ct. 849, 851, 136 L.Ed.2d 818, 822), "[e]quitable tolling is not permissible where it is inconsistent with the text of the relevant statute." (United States v. Beggerly (1998) 524 U.S. 38, 48, 118 S.Ct. 1862, 1868, 141 L.Ed.2d 32, 41; United States v. Brockamp, supra, 519 U.S. at pp. 350-351, 117 S.Ct. at pp. 851-852, 136 L.Ed.2d at pp. 822-823.)
Accordingly, we must determine whether, and to what extent, a continuing violation theory is compatible with the distinctive language of Government Code section 12960.

C. The Continuing Violation Doctrine
California courts have applied the continuing violation doctrine to Government Code section 12960, drawing the doctrine from federal case law. (See Accardi, supra, 17 Cal.App.4th at p. 349, 21 Cal. Rptr.2d 292; Watson v. Department of Rehabilitation (1989) 212 Cal.App.3d 1271, 261 Cal.Rptr. 204 (Watson); Valdez v. City of Los Angeles (1991) 231 Cal.App.3d 1043, 282 Cal.Rptr. 726 (Valdez); City and County of San Francisco v. Fair Employment & Housing Com. (1987) 191 Cal. App.3d 976, 982-983, 236 Cal.Rptr. 716 (City and County of San Francisco).) For instance, Watson and Valdez apply the doctrine, relying on federal law and a state appellate decision, City and County of San Francisco, which, in turn, relies solely on federal law. The fourth California appellate decision applying the doctrineAccardi supra, 17 Cal.App.4th at p. 349, 21 Cal.Rptr.2d 292relies on a federal case and Watson and Valdez, which, as noted, are ultimately premised on federal law.
However, federal case law concerning the continuing violation doctrine has been described as "`inconsistent and confusing'" (Dumas v. Town of Mount Vernon, Ala. (5th Cir.1980) 612 F.2d 974, 977)[10], "vague" (Moskowitz v. Trustees of Purdue University (7th Cir.1993) 5 F.3d 279, 281 (Moskowitz)), and "complicated and confusing, in part because there are a number of different theories ... and in part because some of the concepts involved, pose very difficult line-drawing problems" (B. Schlei and P. Grossman, Employment Discrimination Law 884 (1976)).
In fact, federal case law suggests that there are at least three distinct theories on which the continuing violation doctrine has been based: (1) where "the employer's decision-making process takes place over a period of time, making it difficult to pinpoint the exact day the `violation' occurred" (Stewart v. CPC Intern., Inc. (7th Cir.1982) 679 F.2d 117, 120); (2) where "the employer has an express, openly espoused policy that is alleged to be discriminatory," which continues into the limitations period (Selan v. Kiley (7th Cir.1992) 969 F.2d 560, 565 (Selan)); and (3) where the employer has not engaged in an express policy or practice, but has engaged in a series of discriminatory acts emanating from the same discriminatory animus *239 (Sabree v. United Broth. of Carpenters and Joiners Local No. 33 (1st Cir.1990) 921 F.2d 396, 400, fn. 7 (Sabree)); (Stewart v. CPC Intern., Inc., supra, 679 F.2d at p. 121).
Under the first theory, the employer's decision-making process takes place over time, making it difficult to pinpoint the date of the violation. For the most part, such a circumstance is not at issue here. The vast majority of defendant's decisions concerning whether or how to accommodate plaintiff were completed well before the commencement of the limitations period.
Under the second theory, an express policy is alleged to be discriminatory. (E.g., Williams v. Owens-Illinois, Inc. (9th Cir.1982) 665 F.2d 918, 924, cert. den. 459 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283 (Williams); Valdez, supra, 231 Cal.App.3d at pp. 1052-1053, 282 Cal.Rptr. 726 [discriminatory eligibility list]; see also Bartmess v. Drewrys U.S.A, Inc. (7th Cir. 1971) 444 F.2d 1186, 1187-1188, cert. den. sub nom. Drewrys Ltd. U.S.A, Inc. v. Bartmess 404 U.S. 939, 92 S.Ct. 274, 30 L.Ed.2d 252 [An employer's retirement plan that required female employees to retire at an earlier age than male employees rendered female workers "aggrieved persons" for the entire time they were employed].) In Williams, supra, 665 F.2d at p. 924, for instance, the Ninth Circuit applied the continuing violation doctrine to a discriminatory promotion policy, which continued into the limitations period. The circuit court ruled: "A minority employee who is not promoted in 1973 ... and is subject to a continuing policy against promotion of minorities, may then file a timely charge in 1976, because the policy against promoting him or her continued to violate the employee's rights up to the time the charge was filed." (Ibid.)
However, "courts have differed over whether the existence of the policy itself constitutes a continuing violation, making a suit timely if the policy remains in effect during the actionable period, or whether there must be some actual application of it to the plaintiff within the period." (Berry v. Board of Sup'rs of L.S.U. (5th Cir.1983) 715 F.2d 971, 979 (Berry).) Without resolving that dispute, it is nonetheless evident that where the employer has an express policy claimed to be discriminatory, its continuation into the limitations period exposes the policy to a timely suit. This theory keeps faith with the legislatively enacted limitations period under Government Code section 12960 since the challenge is to a policy that has been continued into the limitations period. However, we need not address the contours of this version of the continuing violation doctrine: This is not a case of an express company policy that discriminates against disabled persons and which continued into the limitations period. Plaintiff does not argue otherwise.
Instead, it is the third theory that is relevant herewhere the employer has, over a period of time, engaged in a series or pattern of discrete, allegedly discriminatory actsin this case, a series of disparate failures to accommodate plaintiffs disability involving matters ranging from cots and computers to ramps and reception areas.
Significantly, the California appellate decisions that have sustained a claim under the FEHA as a continuing violation have drawn their authority from cases that apply the doctrine based on the second theoryan express policy that continues into the limitations period. For instance, Valdez, supra, 231 Cal.App.3d at p. 1053, 282 Cal.Rptr. 726, and City and County of San Francisco, supra, 191 Cal.App.3d at p. 983, 236 Cal.Rptr. 716, concerned a discriminatory eligibility list for promotions that continued into the actionable period; they relied on Williams, supra, 665 F.2d at p. 924, which applied the doctrine to a discriminatory policy. And although Accardi supra, 17 Cal.App.4th at p. 349, 21 Cal. Rptr.2d 292upon which plaintiff heavily relies in this caseapplies the continuing *240 violation doctrine to sexual harassment over an 11-year period, that decision ultimately draws its authority from cases that apply the doctrine to an express employment policy that continued into the limitations period. Specifically, the Court of Appeal in Accardi supra, stated that under the continuing violation doctrine, "a complaint arising under the FEHA is timely if any of the discriminatory practices continues into the limitations period." (Italics original.) However, it relied on Valdez, supra, 231 Cal.App.3d 1043, 282 Cal.Rptr. 726, in making that statement, and Valdez addressed a discriminatory eligibility list that continued to affect the plaintiff into the limitations period. (Valdez, supra, 231 Cal.App.3d at p. 1053, 282 Cal.Rptr. 726.) Thus, Valdez concerned an express policy that continued into the actionable period, not a series of discriminatory practices occurring outside the limitations period of the type relevant here or in Accardi The other case cited by Accardi for this proposition, Abrams v. Baylor College of Medicine (5th Cir.1986) 805 F.2d 528, 531-534, does not stand for it, and indeed concerned a discriminatory policy.
Following its unsupported statement concerning "discriminatory practices," the Accardi court immediately shifted to an enunciation of the continuing violation doctrine in the context of a policy: A "`... systematic policy of discrimination is actionable even if some or all of the events evidencing its inception occurred prior to the limitation's period.' [Citation.]" (Accardi, supra, 17 Cal.App.4th at p. 349, 21 Cal.Rptr.2d 292.)
Finally, Watson, supra, 212 Cal.App.3d at pp. 1290-1291, 261 Cal.Rptr. 204, upon which Accardi relied for that latter proposition, and Valdez, supra, 231 Cal.App.3d at pp. 1052-1053, 282 Cal.Rptr. 726, upon which Accardi relied for its earlier proposition, all relied on Williams and City and County of San Francisco, which, in turn, relied on Williams. And Williams, supra, 665 F.2d at p. 924, as noted, was premised on the existence to a discriminatory policy [that] carried forward into the limitations period," not a series of discriminatory acts, as relevant here. Indeed, Williams even distinguished past discriminatory acts from a discriminatory policy that continued into the limitations period: "We emphasize that a continuing violation exists only if Owens-Illinois'[s] promotion policy was discriminatory and continued in effect into the permissible limitations period. A continuing violation should be distinguished from the continuing impact of a past, yet discrete and no longer existent discriminatory act." (Id. at p. 925, fn. 3, original italics.)
Hence, all four California appellate decisions that apply the continuing violation doctrine ultimately draw their support from case law premised on a continuing violation in the context of an express policy, and not on the third theory relevant here, a continuing violation based on a series of discriminatory acts. We now turn to that theory.
A review of recent decisions by the First, Third, Fifth, Seventh, and Tenth Circuits reveals that in those instances where an employer has committed a series of allegedly discriminatory acts, the continuing violation doctrine applies only if the discriminatory nature of the acts would not have been apparent until they were viewed cumulatively in light of later acts committed during the actionable period: "[T]he purpose of permitting a plaintiff to maintain a cause of action on the continuing violation theory is to permit the inclusion of acts whose character as discriminatory acts was not apparent at the time they occurred." (Doe v. R.R. Donnelley & Sons Co. (7th Cir.1994) 42 F.3d 439, 446; accord, e.g., Bullington v. United Air Lines, Inc. (10th Cir.1999) 186 F.3d 1301, 1310; Filipovic v. K & R Express Systems, Inc. (7th Cir.1999) 176 F.3d 390, 396; Huckabay v. Moore (5th Cir.1998) 142 F.3d 233, 238 (Huckabay); West v. Philadelphia Elec. Co. (3d Cir.1995) 45 F.3d 744, 755; Sabree, supra, 921 F.2d at p. 402.)
*241 The Fifth Circuit explains: "`The core idea of the continuing violations doctrine theory, however, is that equitable considerations may very well require that the filing periods not begin to run until facts supportive of a [discrimination claim] are or should be apparent to a reasonably prudent person similarly situated. The focus is on what event, in fairness and logic, should have alerted the average lay person to act to protect his rights.'" (Huckabay, supra, 142 F.3d at p. 238, quoting Messer v. Meno (5th Cir.1997) 130 F.3d 130, 134.) The Fifth Circuit has established a three-factor analysis to determine whether a continuing violation exists: "Although there is no definitive standard for what constitutes a continuing violation, the plaintiff must demonstrate more than a series of discriminatory acts. He must show an organized scheme leading to and including a present violation [citation], such that it is the cumulative effect of the discriminatory practice, rather than any discrete occurrence, that gives rise to the cause of action. [Citations.] [¶] This inquiry may involve several factors, including the following three: [¶] `The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring ... or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights ...? [Citation.]'" (Huckabay, supra, 142 F.3d at p. 239, fn. omitted, quoting Berry, supra, 715 F.2d at p. 981.)
The Tenth Circuit has adopted the three-factor test used by the Fifth Circuit and has observed that "[t]he continuing violation doctrine `is premised on the equitable notion that a statute of limitations should not begin to run until a reasonable person would be aware that his or her rights have been violated.'" (Bullington v. United Air Lines, Inc., supra, 186 F.3d at p. 1310; accord, Martin v. Nannie and the Newborns, Inc. (10th Cir.1993) 3 F.3d 1410,1415, fn. 6.) It has explained: "[I]f an event or series of events should have alerted a reasonable person to act to assert his or her rights at the time of the violation, the victim cannot later rely on the continuing violation doctrine to overcome the statutory requirement of filing a charge ... with respect to that event or series of events." (Martin v. Nannie and the Newborns, Inc., supra, 3 F.3d at p. 1415.)
Likewise, the First Circuit has acknowledged that "[a] knowing plaintiff has an obligation to file promptly or lose his claim. This can be distinguished from a plaintiff who is unable to appreciate that he is being discriminated against until he has lived through a series of acts and is thereby able to perceive the overall discriminatory pattern." (Sabree, supra, 921 F.2d at p. 402; see also West v. Philadelphia Elec. Co., supra, 45 F.3d at p. 755; Roberts v. Gadsden Memorial Hosp. (11th Cir.1988) 835 F.2d 793, 800, mod. 850 F.2d 1549, 1550.)
The Seventh Circuit makes the most eloquent explanation of the justification for, and the contours of, the continuing violation doctrine: "Under the doctrine of equitable tolling ... a person injured by an unlawful act need not sue until he knows, or through the exercise of reasonable diligence would have known, not only that he has been injured ... but also that he has been injured by a possibly wrongful act of the defendant.... If it is only with the benefit of hindsight, after a series of discriminatory acts, that the plaintiff can realize that he is indeed a victim of unlawful discrimination, he can sue in regard to all of the acts provided he sues promptly after learning their character, even if the statute of limitations has run on all of them. If, however, he knows or with the exercise of reasonable diligence would have known after each act that it was discriminatory and had harmed him, he may not sit back and accumulate all the discriminatory acts and sue on all within *242 the statutory period applicable to the last one. So the fact that a series of discriminatory or otherwise unlawful acts is indeed a series, a continuum, rather than a concatenation of unrelated acts, will delay the deadline for suing with respect to the earliest acts in the series only if their character was not apparent when they were committed but became so when viewed in the light of the later acts. [¶] Only in such a case is it proper to describe the acts as adding up to a `continuing violation' that allows the plaintiff to defer suing until the end of the statutory period ... applicable to the last act." (Moskowitz, supra, 5 F.3d at pp. 281-282.)
More recently, the Seventh Circuit has explained that the "continuing violation doctrine is applicable only if `it would have been unreasonable to expect the plaintiff to sue before the statute ran on th[e] conduct, as in a case in which the conduct could constitute, or be recognized, as actionable harassment only in the light of events that occurred later, within the period of the statute of limitations.'" (Filipovic v. K & R Express Systems, Inc., supra, 176 F.3d at p. 396, quoting Galloway v. General Motors Serv. Parts Operations (7th Cir.1996) 78 F.3d 1164, 1167.)
We find for a number of reasons that the continuing violation theory, so defined, is compatible with the text of the one-year limitations period under Government Code section 12960.
First and foremost, a doctrine that triggers the running of the statute of limitations only once the discriminatory character of the employer's conduct is cognizable is "consistent with the remedial purpose of the FEHA to safeguard the employee's right to seek, obtain, and hold employment without experiencing discrimination." (Romano v. Rockwell Internal, Inc. (1996) 14 Cal.4th 479, 493, 59 Cal.Rptr.2d 20, 926 P.2d 1114.) That purpose is furthered when redress is permitted to an employee, who, in the exercise of reasonable diligence, could not have been aware of the discriminatory nature of a series of acts until viewed in light of the later acts occurring during the limitations period. Conversely, the FEHA's purpose would be thwarted if an employee, who could not have been aware of the discriminatory character of the acts without the benefit of more recent, timely acts, is barred from bringing suit.
Second and apropos of the first point, the Act prohibits some practices, like a hostile work environment, where it is only the accumulation of discrete acts that results in the unlawful practice, thus making recognition of a continuing violation doctrine a necessity for remedying the violation. For instance, to state a cause of action for a hostile work environment, the harassment must be "sufficiently pervasive so as to alter the conditions of employment and create an abusive environment." (Mogilefsky v. Superior Court (1993) 20 Cal.App.4th 1409, 1414, 26 Cal.Rptr.2d 116.) Were the limitations period under Government Code section 12960 construed to limit claims that require an accumulation of discrete acts before they can constitute an unlawful practice, a procedural statutethe statute of limitationswould restrict substantive rights. (See Dasgupta v. University of Wisconsin Bd. of Regents (7th Cir.1997) 121 F.3d 1138, 1139 ["The clearest examples [of a continuing violation] involve sexual harassment, where ... duration is often necessary to convert what is merely offensive behavior, and therefore not actionable under Title VII [citations], into an actionable alteration in the plaintiffs working conditions"]; West v. Philadelphia Elec. Co., supra, 45 F.3d at p. 755 ["There is a natural affinity" between hostile work environment and continuing violation theories]; Villines v. United Broth, of Carpenters & Joiners (D.D.C.1998) 999 F.Supp. 97, 102 (Villines) ["... if the conduct could be recognized as actionable harassment only in light of the events that occurred later within the statute of limitations, *243 a continuing violation may be found"].) This, too, argues in favor of a construction that reconciles the continuing violation doctrine with the text of Government Code section 12960.
Third, "[b]ecause the antidiscrimination objectives and relevant wording of title VII of the Civil Rights Act of 1964 ... and the Americans with Disabilities Act ... are similar to those of the FEHA, California courts often look to federal decisions interpreting these statutes for assistance in interpreting the FEHA. [Citations.]" (Reno v. Baird, supra, 18 Cal.4th at pp. 647-648, 76 Cal.Rptr.2d 499, 957 P.2d 1333.) The federal courts' acknowledgment that a carefully delineated, continuing violation doctrine is compatible with the short limitations period under Title VII suggests that a similar interpretation of the FEHA may be appropriate, although we are cognizant that the language of Government Code section 12960 is distinctive and may call for some differences.
Fourth, the continuing violation doctrine as defined here is not inconsistent with the language of Government Code section 12960. The continuing violation doctrine merely recognizes that a series of acts only become a cognizable unlawful practice when viewed in light of later acts falling within the limitations period, such as in the case of a hostile work environment claim. Since "it is the cumulative effect of the discriminatory practice, rather than any discrete occurrence, that gives rise to the cause of action" (Huckabay, supra, 142 F.3d at p. 239), the unlawful practice can be deemed to occur within the one-year period and not outside it. (See Dasgupta v. University of Wisconsin Bd. of Regents, supra, 121 F.3d at p. 1139.) In short, as its name suggests, the continuing violation doctrine is a single violation that continues into the actionable period. As such, the right to file a complaint based on its accrual within the actionable period is consistent with the one-year limitations period.
In contrast, a more broadly defined continuing violation doctrine of the type that plaintiff seeks herewhich allows a suit to be premised on a series of discriminatory acts occurring largely outside of the limitations period, where the acts do not require the cumulative effect of later, timely acts to become cognizableis inconsistent with the text of Government Code section 12960. Section 12960 prohibits a complaint from being filed "after the expiration of one year from the date upon which the alleged unlawful practice ... occurred," and grants only two express exceptions: a maximum 90-day extension where the claimant first becomes aware of the facts of the alleged practice after the expiration of the limitations period, and a maximum one-year extension where the claimant misidentifies the employer based on the name on the employee's W-2 form.[11] When the claimant is aware, or should be aware, of the discriminatory nature of the unlawful practices at the time of their occurrence (as is the case here), an extension of the limitations period to cover them is not faithful to the legislative directive that requires that complaints be filed within one year after the unlawful practice has occurred, subject only to a limited grace period where the employee "first obtained knowledge of the facts" after the limitations period expired, or where the employee misidentified the employer based on the name on the W-2 form. (Gov.Code, § 12960.) Such an extension is also irreconcilable with the purpose of the limitations period, which is intended to promote the prompt institution and resolution of employment discrimination claims and to protect defendants from the burden of defending claims arising from employment decisions that are long past. (See Romano v. Rockwell Internal, Inc., supra, 14 Cal.4th at p. 488, 59 Cal. Rptr.2d 20, 926 P.2d 1114; cf. Delaware State College v. Ricks (1980) 449 U.S. 250, 256-257, 101 S.Ct. 498, 503-504, 66 L.Ed.2d 431.) That is not achieved when claims knowingly permitted to expire four, eight, or ten years earlier can be revived by reason of a new claim. In short, a continuing violation doctrine is not a doctrine of continued violations, whereby expired *244 claims can ride on the strength of timely claims through the courtroom door.[12]
Plaintiff nonetheless argues that the continuing violation doctrine as defined herein will place employees "between a rock and hard place [because they would] either antagonize [their] boss and possibly endanger [their] job by filing a formal discrimination charge or risk jeopardizing [their] legal rights if a pattern of prejudice develops." The argument is meritless. The contention that the continuing violation doctrine as defined herein is undesirable because it would require employees to "antagonize" their employer by instituting timely claims is, in essence, an objection to any limitations statute that does not offer an unlimited period within which to bring a complaint as long as the employee remains employed. As such, it is a policy argument that ignores the fact that the Legislature arrived at a different policy when it imposed a one-year period within which to file complaints in order to encourage prompt institution and resolution of discrimination claims. Likewise, plaintiffs contention that the failure to file a timely discrimination charge will jeopardize an employee's legal rights if a pattern of discrimination develops ignores the fact that if the discriminatory character of a series of acts is not cognizable until viewed cumulatively in light of later acts arising during the limitations period, the employee may still bring a timely claim under the continuing violation doctrine. Conversely, if the employee was aware to the discriminatory nature of the prior employment practice, but allowed the limitations period to expire, he or she is still free to file a timely claim based on a subsequent employment practice that constitutes a part of the pattern and falls within the limitations period. What plaintiff may not do, however, is to accumulate years of otherwise expired claims over the course of her employment and bring them only after its termination on the ground that compliance with the statutory one-year limitations period would have antagonized her employer. That rewrites the statutory language and changes the policy underlying the one-year limitations perioda shift that is the province of the Legislature, not the courts.
Accordingly, to establish that a claim premised on a series of allegedly discriminatory acts falls within the continuing violation doctrine, the plaintiff must make two showings. First, he or she must demonstrate that at least one act occurred within the limitations period. This is a uniform requirement expressed in the federal cases. (E.g., West v. Philadelphia Elec. Co., supra, 45 F.3d at pp. 754-755; Villines, supra, 999 F.Supp. at p. 102.)
Second, before plaintiff can reach back and recover for a series of acts outside the limitations period, the discriminatory character of the acts must not have been cognizable *245 when they were committed but must become so only when viewed cumulatively in the light of the later acts. (Moskowitz, supra, 5 F.3d at p. 282; Sabree, supra, 921 F.2d at p. 402.) Once the plaintiff "knows or with the exercise of reasonable diligence would have known after each act that it was discriminatory and had harmed him [or her], [the plaintiff must] ... sue on all within the statutory period applicable to the last one." (Moskowitz, supra, 5 F.3d at p. 282.)

D. Plaintiffs Citations Do Not Constitute Persuasive Authority for a More Broadly Defined Doctrine
Accardi supra, 17 Cal.App.4th 341, 21 Cal.Rptr.2d 292, relied upon heavily by plaintiff, is not persuasive authority in support of a broader construction of the continuing violation doctrine. First, Accardi did not consider the rationale underlying the continuing violation doctrine or attempt to reconcile it with Government Code section 12960. Second, its citations to the continuing violation doctrine were ultimately based on inapposite authority: It relied on Valdez and Watson, which, in turn, relied on City and County of San Francisco, supra, 191 Cal.App.3d at p. 983, 236 Cal.Rptr. 716, and Williams, supra, 665 F.2d at pp. 924-925, both of which concerned a discriminatory policy, not a series of discriminatory acts, as relevant in Accardi (See ante at p. 240.) It also relied on a Fifth Circuit case, Abrams v. Baylor College of Medicine, supra, 805 F.2d at pp. 531-534, which not only concerned a discriminatory policy but agrees with our analysis. Third, and despite the foregoing, the narrow holding of Accardi is not inconsistent with our analysis because it invoked the continuing violation doctrine to reverse an order sustaining demurrers to a hostile work environment claim, some of the acts of which were alleged to have occurred during the actionable periodthe very type of claim most suited to the continuing violation doctrine as defined here.
In Accardi the plaintiff, a female police officer, claimed that she had been the subject to an 11-year (1980 to 1991) pattern to sexual harassment. She alleged that in 1991, after she suffered a knee injury, she was excluded from light duty assignments given to injured male officers, that city employees filed false reports stating that she was no longer disabled, and that she was told by her superiors either to quit or declare herself 100 percent fit. The plaintiff filed her FEHA complaint in October 1991. The defendant employer and coworkers (collectively "the defendant") argued that the continuing violation doctrine was unavailable for plaintiffs sexual harassment claim because the events occurring within one year of the date of her FEHA complaint did not relate to sexual harassment but instead to a disputed workers' compensation claim, job assignments, and disability claims. (17 Cal. App.4th at pp. 345-346, 349-350, 21 Cal. Rptr.2d 292.)
The Accardi court issued a writ of mandate directing the trial court to set aside its order sustaining the defendant's demurrers, ruling that "[t]he circumstances alleged ... are sufficiently severe and pervasive so as to establish the existence of a long-standing abusive working environment." (17 Cal.App.4th at p. 350, 21 Cal. Rptr.2d 292.) It concluded that although "[v]iewed in isolation, the acts which are alleged to have taken place in 1989 through 1991 may not be actionable for sex discrimination" (17 Cal.App.4th at p. 350, 21 Cal.Rptr.2d 292), "[the plaintiff] may be able to prove that [the defendant's] actions in 1989 through 1991 were a continuation of prior discriminatory practices and that these actions were used as a pretext to provide a deceptive cover of legitimacy. The seemingly nondiscriminatory activities relating to job assignments because of disability may have been undertaken with the purpose of ridding the police department of female officers." (Id. at p. 351, 21 Cal. Rptr.2d 292.)
Thus, Accardi stands for the unremarkable proposition that a plaintiff who pleads that sexual harassment and a hostile work environment continued into the limitations period pleads a timely claim in the context of a demurrer. Where we part company *246 with Accardi is its suggestion that all 11 years of alleged harassment can be reviveda suggestion which fails to address the justification for the continuing violation doctrine or reconcile it with the short, statutory limitations period designed to encourage prompt filing and resolution of claims of discrimination.
Nor do the other California appellate decisions applying the continuing violation doctrine support a broader definition of the doctrine. As already noted, Valdez, supra, 231 Cal.App.3d at p. 1053, 282 Cal. Rptr. 726, and City and County of San Francisco, supra, 191 Cal.App.3d at p. 983, 236 Cal.Rptr. 716, addressed a discriminatory policydiscriminatory eligibility lists for promotionsthat continued into the limitations period, not the type of continuing violation that plaintiff alleges here. Moreover, the other California appellate decision sustaining an FEHA claim as a continuing violation, Watson, supra, 212 Cal.App.3d at pp. 1290-1291, 261 Cal.Rptr. 204, while applying the doctrine to a claim involving harassment, relied solely on Williams and City and County of San Francisco for support, which decisions are inapposite because they are policy-based continuing violations. (E.g., Williams, supra, 665 F.2d at p. 924 ["For present purposes, ... the relevant strain of continuing violation doctrine is that a systematic policy of discrimination is actionable even if some or all of the events evidencing its inception occurred prior to the limitations period.... A minority employee who is not promoted in 1973 ... and is subject to a continuing policy against promotion of minorities, may then file a timely charge in 1976, because the policy against promoting him or her continued to violate the employee's rights up to the time the charge was filed."].) Further, Watson is a unique case since the employer in that case had timely notice that the plaintiff claimed discrimination: Watson involved successive charges filed with the Department, and the employer's contention was that a second charge, filed during litigation, claiming harassment in retaliation for the first charge, was untimely.
Plaintiff also argues that the Legislature's failure to "overrule" the continuing violation doctrine "reflects the Legislature's approval of the [California appellate] decisions applying the doctrine," based on the rule of statutory construction that "`[w]here a statute has been construed by judicial decision, and that construction is not altered by subsequent legislation, it must be presumed that the Legislature is aware of the judicial construction and approves of it.'" (Wilkoff v. Superior Court (1985) 38 Cal.3d 345, 353, 211 Cal.Rptr. 742, 696 P.2d 134.)
The argument fails for three reasons. First, we are not abandoning the continuing violation doctrine. We are defining itin a manner that is compatible with the language of the statute and which comports with the weight of federal decisions that have analyzed the doctrine. Significantly, the California appellate decisions that have acknowledged the doctrine have not heretofore expressly delineated it. Second, the canons of statutory construction are not commands, but merely "guides" to construe statutes. They "will not be used to defeat legislative intent" (People v. Cruz (1996) 13 Cal.4th 764, 782, 55 Cal.Rptr.2d 117, 919 P.2d 731), which would be the case if plaintiffs expansive view of the doctrine was used to revive claims knowingly permitted to expire in contravention of the one-year limitations period. Third, "[legislative inaction has been called a "weak reed upon which to lean' and a `poor beacon to follow' in construing a statute." (2B Sutherland Statutory Construction (5th ed.1992) § 49.10, p. 76, fn. omitted.) In short, it is not one of the more useful rules of statutory construction, since it seeks to discern an earlier Legislature's intent by speculating over the meaning of a later Legislature's inaction. In this case, the Legislature's failure to modify the continuing violation doctrine when it recently amended Government Code section 12960 (to add a grace period for claimants who misidentify their employers) does not suggest any acceptance *247 of the continuing violation doctrine. (Stats.1999, ch. 797 (S.B.211) § 2.) The legislative history of that amendment demonstrates that it was sponsored by a bar association and that no other issue concerning the statute was raised in the committee or floor reports, making a contention that legislative inaction implies legislative acceptance a fiction that offers little guidance in discerning the remainder of the statute's intent. (See, e.g., Sen. Com. on Industrial Relations, Analysis of Sen. Bill No. 211 (1999-2000 Reg. Sess.) February 24, 1999 and March 24, 1999; Assem. Com. on Labor and Employment, Analysis of Sen. Bill No. 211 (1999-2000 Reg. Sess.) July 14, 1999; Sen. Floor Report on Sen. Bill No. 211 (1999-2000 Reg. Sess.) .)
Finally, plaintiff cites Van Steenburgh v. Rival Co. (8th Cir.1999) 171 F.3d 1155, and Anderson v. Reno (9th Cir.1999) 190 F.3d 930, in support of her broad construction of the continuing violation doctrine. However, in Van Steenburgh v. Rival Co., supra, the Eighth Circuit merely ruled that "there was sufficient evidence of a discriminatory act within the limitations period to support the jury's finding of hostile environmental sexual harassment" (171 F.3d at p. 1160), and reversed a district court's grant of judgment as a matter of law in favor of an employer with respect to a sexual harassment claim. The circuit court's ruling that an incident within the limitations period gave rise to an actionable claim if the "jury [was] capable of perceiving the incident as `discriminatory' in light of all the prior incidents of sexual harassment" (171 F.3d at p. 1159) is entirely consistent with our analysis.
In Anderson v. Reno, supra, cited by plaintiff, the Ninth Circuit merely reversed summary judgment in favor of the defendant in a Title VII sexual harassment action based on the statute of limitations, where offensive conduct allegedly occurred within the limitations period and "relate[d] to earlier incidents." (190 F.3d at p. 937.) Again, this particular holding is consistent with our analysis since a sexual harassment claim is most suited to the continuing violation doctrine. Where we part company with Andersonwhich did not analyze the rationale underlying the continuing violation doctrineis its unconsidered acceptance of the proposition that eight years of alleged harassment could be revived by virtue of a timely harassment claim. However, Anderson's authority for that conclusion was Draper v. Coeur Rochester, Inc. (9th Cir.1998) 147 F.3d 1104 (Draper), whose holding did not extend that far. Draper merely concluded in the context of a grant of summary judgment that "a genuine issue of fact [exists] as to whether the hostile work environment [in that case] continued into the relevant period of limitations and, thus, whether [plaintiffs] claim falls under the continuing violation doctrine." (147 F.3d at p. 1109.) In so concluding, the court of appeals in Draper ruled that "in most claims of hostile work environment harassment, the discriminatory acts [are] not always of a nature that [can] be identified individually as significant events; instead, the day-to-day harassment [is] primarily significant, both as a legal and as a practical matter, in its cumulative effect" (147 F.3d at p. 1108)a holding consistent with our analysis.[13]
Accordingly, Anderson and Draper stand, for the most part, for the unremarkable proposition that conduct during the limitations period cannot be viewed in isolation from events preceding that conduct for purposes of determining the existence of a timely hostile work environment claim. Neither Anderson nor Draper analyze how far back a timely hostile work environment claim ought to be permitted to reach for purposes of liability, and thus cannot serve as persuasive authority for any such proposition.
*248 Hence, plaintiffs cases are distinguishable: Her California authorities are all ultimately from inapposite cases based on the continuing violation doctrine in the context of an express policy; none of them consider the rationale underlying the continuing violation doctrine; and none overcome the weight of federal authority defining the continuing violation doctrine. Most importantly, none of them explain how the revival of a known claim allowed to expire can be reconciled with the text and purpose of Government Code section 12960.

E. The Application of the Continuing Violation Theory to Plaintiffs Claims
Accordingly, the continuing violation doctrine, when applied to a series or pattern of allegedly discriminatory acts, only permits an employee to reach back and premise liability on conduct that occurred outside the statute of limitations when the discriminatory nature of the acts was not cognizable when committed but became so when viewed in light of later acts committed during the limitations period.
Since plaintiff filed her FEHA complaint on January 25, 1994, the one-year period preceding plaintiffs administrative complaint commenced on January 25, 1993.[14] Hence, to be timely under the continuing violation doctrine, at least one of the defendant's allegedly unlawful employment practices must fall within the limitations periodbetween January 25, 1993 and plaintiff's resignation on March 8, 1993.
Moreover, to premise liability on discriminatory acts outside of the limitations period, plaintiff must show that their discriminatory character would not have been cognizable in the exercise of reasonable diligence until the actionable period.
We conclude that plaintiff has established the occurrence of unlawful practices during the limitations period, but cannot properly invoke the continuing violation doctrine to premise liability on practices outside of the limitations period.

1. Defendant's Violations Within the Limitations Period
Plaintiff points to her January 27, 1993, typewritten comments (in connection with her 1992 performance evaluation) and her subsequent discussions in 1993 with Kathy Metzger, defendant's human resources administrator, as evidencing unlawful practices.
Plaintiff raised four issues in her typewritten comments: (1) the blocking of the disabled wheelchair ramps by various delivery companies; (2) defendant's failure to establish a fire escape plan for plaintiff; (3) plaintiffs continuing problems with wheelchair access in various parts the building; and (4) defendant's failure to provide her with a correct W-2 form.
Only the continued access problems and the failure to establish a fire escape plan constituted violations during the limitations period.

a. Blockage of the Wheelchair Ramps
In her typewritten comments, plaintiff complained that delivery vehicles belonging to the Postal Service and to a caterer often blocked the wheelchair ramps. Failure to keep a wheelchair ramp accessible can violate an employer's reasonable accommodation obligations, depending upon the circumstances. (See 2 Cal.Code of Regs., § 7293.9, subd. (a).)
However, this was a new problem, and following her receipt of plaintiffs comments, Metzger made certain that the offending parties had been contacted and directed to park their vehicles in a location that would not interfere with the use of the ramps. Plaintiff points to no evidence in the record which would suggest that plaintiffs access to the wheelchair ramps was again impeded following Metzger's efforts. While an employer has a duty to gather sufficient information from the disabled employee to determine what accommodations are necessary to enable the employee to perform the job (Prilliman v. United Air Lines, Inc. (1997) 53 Cal.App.4th 935, *249 62 Cal.Rptr.2d 142), defendant here addressed plaintiffs concern once it was brought to its attention, and cannot therefore be held liable.

b. Preparation of a Fire Escape Plan
In her typewritten comments, plaintiff expressed frustration that an adequate fire escape plan had not been developed with her disability in mind. We would agree with plaintiff that a fire escape plan that takes into account a disabled employee who may need special attention is a reasonable accommodation within the meaning of Government Code section 12940 and its corresponding regulations. (See 2 Cal.Code of Regs., § 7293.9, subd. (a)(1).)
While it is true that upon being informed of plaintiffs concerns, Metzger formed a committee to develop a fire escape plan that would address plaintiffs needs, plaintiff had raised fire escape concerns in the past without response. For instance, plaintiff had previously complained that as a result of the relocation of the library, it was difficult for her to do a U-turn in her wheelchair to escape in the event of fire. We consider it a factual question whether defendant violated its obligation to provide reasonable accommodation in connection with a fire escape plan at any time during the limitations period. The acts of the defendant outside of the limitations period "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue" (United Air Lines, Inc. v. Evans (1977) 431 U.S. 553, 558, 97 S.Ct. 1885, 1888, 52 L.Ed.2d 571, 578); thus, on remand, the trier of fact should determine whether defendant should have made reasonable accommodation with respect to this issue at an earlier point in time and if so, whether it failed to do so at any time during the limitations period.

c. Hallway and Related Access Issues
In her typewritten comments, plaintiff complained that she continued to have access problems because of the placement of furniture, such as bookcases and filing cabinets, in the hallways. Reasonable accommodation requires that a disabled employee have access to those areas necessary to perform the functions of his or her position. (2 Cal.Code of Regs., § 7293.9, subd. (a)(1).)
Upon receiving plaintiffs complaints, Metzger directed plaintiff to point out to her the various areas where access was a problem. Thereafter, Metzger ordered the offending items removed and/or relocated. The problem areas pointed out by plaintiff were cleared prior to the date plaintiff resigned.
However, hallway access was one of plaintiffs long-standing grievances. Plaintiff had complained about it in her October 1990 memorandum, and yet nothing had been done previously. The reasonable accommodation finally made in 1993over two years latercannot be viewed as timely and thus reasonable. (See 29 C.F.R., App. § 1630.2(o).) As long as a failure to accommodate extended into the limitations period and no final decision thereon was made outside the limitations period, a claim based thereon is clearly timely.[15] And Metzger's efforts show that accommodation was easy and not a substantial hardship. Accordingly, although a failure to accommodate outside of the limitations period cannot be the basis of a claim, a failure to accommodate within the limitations period can be a basis for a claim. Plaintiffs earlier requests for accommodation with respect to this issue is relevant background evidence (United Air Lines, Inc. v. Evans, supra, 431 U.S. at p. 558, 97 S.Ct. at p. 1888, 52 L.Ed.2d at p. 578) for purposes of determining whether accommodation should have been made earlier during the limitations period.
The same analysis applies to access to the supply room and the elevator, and traction on the wheelchair ramp. Although plaintiff needed supplies, she testified that the supply room was inaccessible, that there was no staff or clerical person to get her supplies, and that her suggestion *250 in 1991 to rearrange the supply room was never acted on. The continuation into the limitations period of this failure to accommodate could constitute a timely violation, depending upon all of the facts. Likewise, depending upon the facts, the continued failure into the limitations period to adjust the elevator might constitute a failure to accommodate during the actionable period. Finally, plaintiff contends that her power wheelchair did not resolve her complaints concerning the slickness of the wheelchair ramp because she was not always in a position to use that wheelchair (when it was not working or could not fit into the vehicle that was transporting her); consequently, she contends that she continued to request, without success, modification of the ramp into 1993. Viewing the evidence in the light most favorable to the plaintiff, the defendant's continued failure to take any further measures to improve the traction of the ramp might again constitute a failure to accommodate during the limitations period, depending upon the circumstances. Thus, these issues are remanded to the trial court for further proceedings.[16]

d. The W-2 Form.
Finally, in her typewritten comments, plaintiff complained that for the previous three tax years (1989-1991), her W-2 forms were both tardy and incorrect, requiring plaintiff to make countless phone calls to defendant's accounting office and to the Internal Revenue Service (IRS).
Unlike the other issues of which plaintiff complained in her typewritten comments, we fail to discern how defendant's inability to provide plaintiff with a correct W-2 form constitutes an unlawful employment practice based on disability. There was no evidence that any individual responsible for preparing the W-2 form acted with a discriminatory motive. In her typewritten comments, plaintiff did not suggest that defendant's failings with regard to the W-2 form were intentional.[17] To the contrary, it appears that these failings were at most negligent, caused by the facts (1) that plaintiffs disability payments were administered by a third party (Standard), (2) that Standard experienced various software difficulties (of which plaintiff was made aware), and (3) that defendant *251 had difficulty in reconciling various IRS rules and guidelines regarding whether plaintiffs disability benefits were taxable. Accordingly, defendant's failure to provide plaintiff with a correct W-2, while no doubt annoying, did not constitute a failure to reasonably accommodate her disability or constitute harassment. It was due to nondiscriminatory errors, not acts based on discrimination.
Moreover, there was testimony that plaintiff had declined assistance until her January 1993 performance evaluation meeting. The problem was resolved once plaintiff asked for assistance. Upon receipt of plaintiffs typewritten comments, Metzger secured from plaintiff a list of, and began contacting, those in the accounting office and elsewhere with whom plaintiff had dealt in trying to resolve the W-2 issue. Prior to the date plaintiff tendered her resignation, Metzger was informed by plaintiff that the W-2 form that plaintiff had received for the 1992 tax year was correct.

2. Plaintiff Cannot Claim a Continuing Violation
Even though plaintiff may be able to establish a failure to accommodate her disability in connection with the lack of a fire escape plan, traction on the wheelchair ramp, and access in the hallways, elevator, and supply room during the limitations period, that does not mean that she can recover for previous acts of discrimination that would otherwise be time-barredunless the discriminatory character of those prior acts was not cognizable "when they were committed but became so when viewed in the light of the later acts." (Moskowitz, supra, 5 F.3d at p. 282.)
In this case, the record reflects that plaintiff had knowledge of the allegedly discriminatory nature of defendant's prior acts long before the commencement of the limitations period on January 25, 1993, but failed to bring suit. Moreover, there is nothing about the defendant's purported failures concerning reasonable accommodation during the limitations period that made the discriminatory character of the conduct outside of the limitations period apparent only in light of the later (timely) failures.
At the heart of plaintiffs claim of discrimination and harassment are the events involving (i) the delay in approving plaintiffs transfer to the Sacramento office, (ii) plaintiffs "storage room" office, (iii) plaintiffs request for a computer, (iv) the cot, and (v) the temporary refusal to allow the plaintiff to work at home.
Yet, each of these discrete events occurred years prior to the institution of plaintiffs administrative complaint: The delay in approving plaintiffs transfer to the Sacramento office occurred between March 1989 and February 1990 (when the transfer was finally approved); the issue over the "storage room" office was resolved in the summer of 1990, when plaintiff moved into a new office; the computer issue was resolved in December 1989 when plaintiff informed the defendant that it "no longer need[ed] to consider the issue of providing [her] with a computer" since she had secured funding for one; plaintiff vetoed the "black hole" location for her cot, and plaintiff dropped the issue of the cot after it was moved to a vacant office near plaintiffs in late 1991[18]; and the refusal to allow the plaintiff to work at home was resolved when plaintiffs departmental manager granted her permission to do so in October or November 1990. In each case, plaintiff can hardly contend that the past failure to accommodate her only became clear in January 1993. To the contrary, the discriminatory nature of all of these grievances was clear before plaintiff took her three-and-one-half-month leave of absence from August to November 1992.
Plaintiff's other complaints are equally stale. For example, plaintiff complained about the difficulty in opening some of the doors in the building in January 1990, but in February 1990, plaintiff took care of the problem with the assistance of her boyfriend and other friends. Likewise, her grievance that Gary Dobson's equipment and furniture impeded her ingress to her *252 office was resolved when plaintiff moved to a new office in a different part of the building in June 1990. Again, the grievance over the closing of the reception area door was resolved following plaintiffs issuance of her October 1990 memo. Plaintiffs complaint concerning access to the library to retrieve materials was no longer a problem in mid-1992 when the library was relocated.
In testifying as to why she resigned from her employment, plaintiff gave as one of her reasons the fact that Harding had "sullied" her reputation by insisting that plaintiff misrepresented her medical condition when she applied for employment. Yet, plaintiff was aware in January 1990 that her reputation had been "sullied" by Harding.
We also observe that plaintiff was aware of her rights long before she filed her 1994 administrative complaint. Plaintiff had consulted with a lawyer as early as 1989 with respect to whether her request for a computer fell within an employer's duty to reasonably accommodate her disability. Simultaneously, she contacted private agencies, such as Resources for Independent Living, to determine her right to reasonable accommodation.
Finally, plaintiff all but conceded at trial that she continued to work for defendant for an extended period in spite of express statements from her supervisors that defendant would not accommodate her. Plaintiff was told time and again by various supervisors that nothing around the office was going to change and that plaintiff should accept her fate. In 1989, the Redding regional manager told her that the defendant could not accommodate her. Plaintiff testified that in 1990 her supervisor told her that he could not support her requests for accommodation because of the hostile reaction of management. In January 1992, plaintiff was told by her department manager in no uncertain terms to quit complaining and accept her fate, i.e., "`[it's] a brick wall, nothing is going to change, don't bother [complaining].'" And plaintiff complained often about Uhouse's "stonewalling" of her requests for accommodation.
This evidence demonstrates that the discriminatory character of defendant's conduct was apparent before the limitations period commenced and that a continuing violation theory is not viable. Accordingly, plaintiff cannot establish a continuing violation that would permit her to premise liability on any claims that arose prior to January 25, 1993.[19]
We do not in any way condone defendant's treatment of plaintiff prior to January 25, 1993. Defendant may very well *253 have stepped outside the bounds of lawful conduct on different occasions. However, a timely claim cannot resuscitate time-barred claims solely by characterizing them singularly as a "continuing violation." There is no rule that a new, timely claim extends the limitations period to bring suit on otherwise expired, ancient claims. As the United States Supreme Court observed in United Air Lines, Inc. v. Evans, supra, 431 U.S. at p. 558, 97 S.Ct. at p. 1888, 52 L.Ed.2d at p. 578, "A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed.... [I]t is merely an unfortunate event in history which has no present legal consequences."
"Statutes of limitations are not simply technicalities. On the contrary, they have long been respected as fundamental to a well-ordered judicial system." (Board of Regents v. Tomanio (1980) 446 U.S. 478, 487, 100 S.Ct. 1790, 1796, 64 L.Ed.2d 440, 449.) "`[T]he period allowed for instituting suit inevitably reflects a value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones.'" (Delaware State College v. Ricks, supra, 449 U.S. at pp. 259-260, 101 S.Ct. at p. 505, 66 L.Ed.2d at p. 441, quoting Johnson v. Railway Express Agency, Inc. (1975) 421 U.S. 454, 463-464, 95 S.Ct. 1716, 1722, 44 L.Ed.2d 295, 303.) Indeed, the California Supreme Court has clarified that an affirmative defense based on the statute of limitations should not be characterized as "disfavored" since the public policy of repose, supported by the statute of limitations, is "no less important or substantial" than the public policy supporting disposition of a cause of action on the merits. (Norgart v. Upjohn Co. (1999) 21 Cal.4th 383, 396, 87 Cal.Rptr.2d 453, 981 P.2d 79.) Statutes of limitations "`"are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them."'" (Gutierrez v. Mofid (1985) 39 Cal.3d 892, 898, 218 Cal.Rptr. 313, 705 P.2d 886, citations omitted; accord, Adams v. Paul (1995) 11 Cal.4th 583, 592, 46 Cal.Rptr.2d 594, 904 P.2d 1205.)
The misapplication of the continuing violation doctrine in this case allowed plaintiff to raise five years of disparate discriminatory incidents, notwithstanding the one-year limitations period. This not only allowed an undue accumulation of claims, which could have been resolved earlier, but put defendant at a distinct disadvantage. Many of the important players on defendant's side were unable to recall events or conversations occurring years earliera fact pointed out by counsel for plaintiff in closing argument as demonstrating a lack of credibility. In contrast, plaintiff had the benefit of 93 pages of notes that she had prepared in anticipation of her claim and which she could bring at a time of her choosingbut for the statute of limitations. She thus had no difficulty whatsoever in reconstructing all of the various events and conversationsfrom her point of viewwhich formed the heart of her harassment and discrimination claims. Having waited until after she resigned to bring discrimination claims covering five years of events, plaintiffs case falls into that category of decisions which hold that a discriminatory act that is not made the basis of a timely charge is "merely an unfortunate event in history which has no present legal consequences." (United Air Lines v. Evans, supra, 431 U.S. at p. 558, 97 S.Ct. at p. 1888, 52 L.Ed.2d at p. 578.)

*254 DISPOSITION
The judgment is reversed, and the matter is remanded to the trial court for further proceedings consistent with this opinion. Plaintiff may proceed on her claims concerning defendant's failure to reasonably accommodate her in connection with a fire escape plan, hallway access, traction on the wheelchair ramp, and access to the elevator and the supply room.[20] The parties shall bear their own costs on appeal.
SCOTLAND, P.J., and NICHOLSON, J., concur.
NOTES
[1] MS is a slowly progressive, debilitating disease of the central nervous system. (The Merck Manual (17th ed.1999) p. 1474.) "The disease is characterized by various symptoms and signs of [central nervous system] dysfunction, with remissions and recurring exacerbations." (Ibid.)

Dr. Swank, plaintiff's treating physician and an international expert on MS, testified that MS is a fluctuating disease in which a patient's symptoms may come and go, depending in large part on the level of stress and exertion that the patient sustains.
[2] Since we are assessing the sufficiency of the evidence to establish timely claims, the facts are set forth in the light most favorable to plaintiff, unless specified otherwise. (Nestle v. City of Santa Monica (1972) 6 Cal.3d 920, 925, 101 Cal.Rptr. 568, 496 P.2d 480.)
[3] The legal advice plaintiff received was that her computer request "was [] a reasonable accommodation and should be no problem."
[4] According to Bottorff, plaintiff made no complaint to him about the new location for the cot.
[5] Bottorff testified that prior to 1993, in response to a comment by plaintiff about "access around the office, in general," he offered to raise the matter with Uhouse, but plaintiff declined his offer.
[6] Bottorff testified that plaintiff had mentioned the W-2 problem on an earlier occasion. He had offered to help, but plaintiff declined his offer, claiming that she was the person most able to resolve the matter. Bottorff testified that the January 1993 evaluation meeting was the first time that plaintiff had asked for his assistance in resolving the problem.
[7] Government Code section 12940, subdivision (h)(1), provides in relevant part that it is an unlawful employment practice "[f]or an employer ... because of ... physical disability, mental disability, [or] medical condition ... to harass an employee or applicant. Harassment of an employee ... by an employee other than an agent or supervisor shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action...."

Section 12940, subdivision (k) makes it an unlawful employment practice "[f]or an employer ... to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee. Nothing in this subdivision ... shall be construed to require an accommodation that is demonstrated by the employer ... to produce undue hardship to its operation."
[8] Under Government Code section 12960, a complaint may not be filed "after the expiration of one year from the date upon which the alleged unlawful practice occurred." Government Code section 6803 defines year as "a period of 365 days." Both Government Code section 6800 and Code of Civil Procedure section 12 provide that "[t]he time in which any act provided by law is to be done is computed by excluding the first day, and including the last, unless the last day is a holiday, and then it is also excluded." Thus, since a complaint filed on January 25, 1994, would be exactly 365 days (one year) after January 25, 1993, excluding the first day (January 25, 1993) as required by Government Code section 6800, the complaint could timely allege an unlawful practice occurring on January 25, 1993. Such a complaint would have been filed within one year, and not "after the expiration of one year from" January 25, 1993. (Gov.Code, § 12960.)
[9] In 1999, the Legislature amended section 12960 to add another exception to the one-year period "not to exceed one year following a rebutted presumption of the identity of the person's employer under [Government Code s]ection 12928, in order to allow a person allegedly aggrieved by an unlawful practice to make a substitute identification of the actual employer." (Stats. 1999, ch. 797 (S.B.211) § 2.) The "rebutted presumption of the identity of the person's employer" refers to the rebuttable presumption under Government Code section 12928 that "employer" includes any person identified as the employer on the employee's W-2 form. Since this appeal does not involve the misidentification of an employer based on a misidentification of the employer on the employee's W-2 form, we need not address this additional exception.
[10] Dumas v. Town of Mount Vernon, Ala., supra, was overruled on other grounds in Larkin v. Pullman-Standard Div., Pullman, Inc. (11th Cir.1988) 854 F.2d 1549, 1569, which itself was vacated by Pullman-Standard, Inc. v. Swint (1989) 493 U.S. 929, 110 S.Ct. 316, 107 L.Ed.2d 307.)
[11] See footnote 9, ante.
[12] To be sure, one could argue that allowing recovery for any acts occurring outside of the limitations periodeven where the discriminatory nature of those acts is not apparent until viewed cumulatively in light of later actsis inconsistent with a one-year limitations period that offers only a limited 90-day grace period where the employee "first obtains knowledge of the facts" after the expiration of the limitations period. (Gov.Code, § 12960.) However, the circumstance covered by the grace periodfailure to obtain knowledge of the factsdiffers from the circumstances covered by the continuing violation doctrine as defined here. The grace period applies to a single unlawful employment practice, the facts of which are not known to the employee until the expiration of the limitations period. (See Williams v. City of Belvedere (1999) 72 Cal.App.4th 84, 92-93, 84 Cal. Rptr.2d 658.) The continuing violation doctrine, as defined here, involves a series of acts, whose discriminatory nature only becomes cognizable when viewed cumulatively in light of later acts, such as in the case of a hostile work environment claim. Thus, the continuing violation doctrine requires new acts before the discriminatory nature of the earlier acts becomes cognizable and is not covered by, or inconsistent with, the 90-day grace period, which covers the instance where the facts of the earlier act are unknown to the claimant until after the limitations period expires. Indeed, the doctrine is consistent with the one-year limitations period because the unlawful employment practice only becomes cognizable within the limitations period.
[13] In a petition for rehearing, Plaintiff claims that this holding in Draper, supra, is not consistent with our analysis because the plaintiff in Draper complained to management about harassment before the start of the limitations period and thus was aware of the discriminatory nature of such harassment outside of the limitations period. However, Draper did not hold that the complaint concerning that earlier harassment was timely, but only that a genuine issue existed "as to whether the hostile work environment continued into the relevant period of limitations." (147 F.3d at p. 1109.)
[14] See footnote 8, ante.
[15] Such a circumstance is akin to the first theory for the continuing violation doctrine where the employer's decision-making process takes place over a period of time, making it difficult to pinpoint the exact time of the violation.
[16] Plaintiff also complained to Metzger about obstacles in the lunchroom, primarily plaintiff's access to the microwave. Metzger made changes to allow plaintiff access to the microwave. Two days later, the microwave was again blocked, this time by the placement of an ice chest on the counter. Metzger directed the graphics department to make a sign to the effect that the area was to be left clear, and she placed the sign on the microwave counter. There is nothing in the record to establish that plaintiff's access to the microwave was ever again impeded. Although this, too, was a long-standing grievance, there is nothing in the record that suggests that plaintiff was restricted in her use of the microwave at any time during the actionable period since she testified that her fellow employees helped her to place her items in the microwave. At oral argument, plaintiff's counsel acknowledged that she was not aware of any testimony to the effect that plaintiff had been unable to use the microwave at any point during the limitations period. Accordingly, she cannot base a timely claim on access to the microwave. (See Vande Zande v. State of Wis. Dept. of Admin. (7th Cir.1995) 44 F.3d 538, 546 ["we conclude that access to a particular sink, when access to an equivalent sink, conveniently located, is provided is not a legal duty of an employer"].)
[17] Plaintiff makes such a claim on appeal, arguing that Harding deliberately tampered with her disability payments, and as a result, the jury "could reasonably infer that the continuing problems [plaintiff] experienced with [overpayments], under-payments, overwithholding and under-withholding were attributable to Harding's interference." We disagree.

There is no competent evidence in this record that plaintiff's problems with her W-2 forms were occasioned by the intentional misconduct of anyone associated with defendant. Over a hearsay objection, plaintiff was permitted to testify that one of her superiors told her that "Harding ... had been attempting to foul up [her] disability payments. [¶] Actually, I guess `foul up' was not the right word. It was [to] restrict me from having the disability payments." (Italics added.)
Whatever the value of this testimony which simply suggests that Harding wanted to bar plaintiff's receipt of disability benefitsit hardly establishes that any of the problems plaintiff experienced with her yearly W-2 forms was the result of any intentional misconduct. Plaintiff presented no evidence of any discrimination on the part of the people responsible for preparing her W-2 forms.
[18] Moreover, there was no evidence in the record to suggest that this new location was not a reasonable accommodation.
[19] In a petition for rehearing, plaintiff argues that "it was error for the Court to decide as a matter of law that the discriminatory character of defendant's conduct was apparent to [plaintiff] before the limitations period commenced" because this was a factual issue for the jury. The short answer is that viewing the facts in the light most favorable to plaintiff, the evidence at trial was insufficient to show a continuing violation. To the contrary, as shown above, the evidence was overwhelming that plaintiff not only should have been aware, but was aware of the discriminatory character of defendant's conduct well before the limitations period commenced. She was told time and again that managers, like Harding and Uhouse, did not want to accommodate her and were treating her differently because of her disability. For instance, plaintiff testified that in 1990, she was told that Uhouse put her office in the storage area because Uhouse thought plaintiff "was milking the company ... because [plaintiff] had MS." Further, the failures to accommodate plaintiff, which arguably continued into the limitations period, did not make apparent the discriminatory character of the time-barred conduct such that the continuing violation doctrine could be invoked here. Nor could those discrete failures to accommodate, which continued into the limitations period and which the defendant promptly proceeded to address within days of the commencement of the limitations period, constitute a hostile work environment. Harassment "consists of conduct outside the scope of necessary job performance" and "is not conduct of a type necessary for management of the employer's business or performance of the supervisory employee's job." (Janken v. GM Hughes Electronics (1996) 46 Cal.App.4th 55, 63, 53 Cal. Rptr.2d 741.) Because reasonable accommodation of the access and fire escape issues arose out of the performance of necessary personnel management duties (see Gov.Code, § 12040, subd. (k)), these purported, limited failures to accommodate could not constitute harassment.
[20] In light of our conclusion, we need not address defendant's other arguments on appeal.